## 42098. BATTLE v. THE STATE.
### (333 SE2d 599)

HILL, Chief Justice.

John Wayne Battle was tried by a jury and convicted of murder and burglary with intent to rape. He was sentenced to life plus 20 years, to be served consecutively.[1]

Judy Lynn Hanson's body was found in her duplex apartment on the morning of December 14, 1983. Although she had been strangled and had received 2 superficial wounds, the fatal blow was a stab wound over 4 inches deep which pierced her heart and aorta.

The victim's neighbor in the other apartment of the duplex said she had been awakened by the victim screaming and begging "no, no, please don't" at about 5:30 a.m. in the morning but did not call the police. Another neighbor testified that she had seen 2 males passing between her apartment and that of the victim earlier the evening before and also said that the defendant had knocked on her porch door about 12:30 that night, but that she had told him to go away because she had already gone to bed.

Investigation of the crime scene revealed that the perpetrator had most likely climbed up on a trash can and moved an air conditioning unit aside in order to enter a back window of the victim's apartment. Footprints were found beneath the air conditioner and on the trash can outside the window. The body was lying on the living room floor, where it was apparent that a struggle had ensued. Also, the victim's purse had been dumped out on her bed. An empty knife sheath was found. Vacuum sweepings, fingerprints lifted from the crime scene and clothing and swabs taken from the victim were sent to the crime lab for identification and analysis.

Meanwhile, investigators pursued the leads provided by the neighbor, including a visit to the apartment where the defendant was staying located nearby. He was not present. There consent to search

---

[1] The victim was killed on December 14, 1983, and the defendant was tried for her murder and burglary on November 12, 1984. No motion for new trial was made, but notice of appeal was filed on December 10, 1984. The transcript was filed in the trial court on February 7, 1985, the record was docketed in this court on March 14, and, after briefing, the case was argued on June 5, 1985.

the one-bedroom apartment was granted by the lessee, Curtis Edwards. Wet black pants and the damp blue jeans underneath them, identified by Edwards as being the defendant's clothes, on a cardboard box in Edwards' closet were seized, along with some wet towels and a wash cloth which had been stuffed behind the water heater. These items were also sent to the crime lab.

The defendant was forcibly arrested for violation of probation and for questioning about the murder at the entrance to his girl friend's apartment. While being interrogated at the police station, the defendant's shoes were obtained from him. Hair samples and finger and palmprints were also collected.

The crime lab was able to match the shoes with the prints found at the scene; a dog hair collected from the defendant's black pants was determined to be similar to that of the victim's dog; a palm and fingerprint taken from the top of the air conditioner were identified as being the defendant's; and it was found that a pubic hair from the victim's body slip was consistent with the defendant's. Slides were made from vaginal swabs which showed the presence of sperm, but no attempt to identify the samples as coming from the defendant was made.

A cellmate with a lengthy record, awaiting trial for armed robbery, testified to a statement made by the defendant to him sometime in April 1984, in which the defendant admitted the details of the crimes. According to this witness, the defendant said he entered the victim's unoccupied apartment by moving the air conditioner; after waiting for the victim to return home, he went to the neighbor's house and was told to go away; upon seeing the victim and a male friend return home, he reentered her apartment, finding a sheath knife in the process; after waiting for the victim's male caller to leave, he raped the victim; when she threatened to call police, he strangled her into unconsciousness and then stabbed her with the knife; he then returned to the apartment where he was staying and changed clothes.

Upon this evidence, the jury found the defendant guilty of murder and burglary with intent to rape.

1. Having reviewed the evidence in the light most favorable to the jury's determination, we conclude that a rational trier of fact could have found the defendant guilty of burglary and murder beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The defendant urges as a denial of his due process rights the refusal by the trial court to provide funds for an independent analysis of a pubic hair discovered on the victim's body slip which was compared with similar hair of the defendant. See *Sabel v. State*, 248 Ga. 10, 17-18 (282 SE2d 61) (1981), where we held that "A criminal defendant on trial for his liberty is entitled on motion timely made to have

an expert of his choosing, bound by appropriate safeguards imposed by the court, examine critical evidence whose nature is subject to varying expert opinion."

On March 9, 1984, defense counsel filed a motion seeking to have the court appoint experts to examine fingerprints, footprints, hair and fiber. At a hearing on April 17 on several defense motions, counsel announced that he was going with the district attorney to the crime lab in Moultrie to examine the physical evidence and would then make a decision whether to pursue the motion for appointment of experts. The evidence at the crime lab was examined by defense counsel on June 20. A crime lab report dated June 21, finding that the fragment of pubic hair found on the victim was "consistent with" the defendant's pubic hair, was provided to defense counsel on September 26.

On October 30, the defense was shown an enlarged photograph showing the two pubic hairs for comparison. On November 5, the defense renewed its motion for court appointed experts to obtain an expert to examine the hair in question, saying that the enlargement showed a "striking similarity" between the two hairs and that an expert qualified in microanalysis had been located who would conduct the examination for approximately $600, plus expenses of travel from Florida. This motion was denied at a hearing on November 6.[2] Trial was scheduled for, and commenced, on November 12, 1984. At trial the state's expert testified that in his opinion the two hairs were similar in enough of the microscopic characteristics to suggest that they could have had a common origin, or were "consistent with" each other.

Assuming without deciding that the hairs in question were "critical evidence"[3] and "subject to varying expert opinion" within the meaning of *Sabel,* supra, we find that the renewed motion for the appointment of an expert was not timely. The existence of this evidence was known to the defense at least since June 20. That the hairs were, according to the crime lab report, "consistent" became known to the defense on September 26. Although the enlarged photograph comparing the two hairs may well have had a visual impact damaging to the defense, the enlargement itself was not critical evidence.

A motion for the appointment of an expert must be timely made.

---

[2] Instead, the trial court ordered that the crime lab and its staff be made available to the defendant for his use. Following a recess, the district attorney advised the trial court and defendant that the crime lab objected to this procedure, saying it was against its policy to allow competing experts from its own laboratories to testify at a trial. The defendant then renewed his motion for the appointment of an independent expert.

[3] In *Carpenter v. State,* 252 Ga. 79 (1) (310 SE2d 912) (1984), we recognized that evidence is "critical" if an expert, by examining it, could induce reasonable doubt into the minds of the jurors.

*Patterson v. State*, 238 Ga. 204, 206 (232 SE2d 233) (1977). "If the defendant knows or in the exercise of reasonable diligence should know of the existence of potentially critical evidence in the possession of the state, yet fails to move in a timely fashion for its examination, then he or she cannot claim unfair surprise by its introduction at trial." *Williams v. State*, 251 Ga. 749, 751 (312 SE2d 40) (1983). The trial court did not abuse its discretion in overruling the defendant's motion.

Moreover, we find that counsel's failure to timely pursue the motion for appointment of an expert and the trial court's refusal to grant the motion when made was harmless beyond a reasonable doubt in view of the other evidence against the defendant. He was staying in a friend's apartment within 250 feet of the victim's residence and was identified by a witness who recognized his voice as having been at the house next door to the victim's at about 12:30 a.m. on the morning of the murder. His palmprints were found on the victim's window air conditioner which had been moved so as to allow entry into the victim's house. A shoe print in that vicinity was found to be similar to defendant's shoes. A dog hair similar to the victim's dog's hair was found on the defendant's wet pants. Defendant admitted to police that he had knocked on the victim's neighbor's door after midnight and that he had been awake and outside in the early morning hours. A fellow inmate testified to a confession, amply corroborated by physical evidence, made by defendant in which he described his movements on the morning in question and admitted raping, strangling and stabbing the victim. The proof against the defendant was more than sufficient to convict without the pubic hair comparison.

3. The defendant also claims error in the trial court's refusal to suppress the physical evidence and the statement he made when first arrested, claiming the arrest was without probable cause. The physical evidence collected included his fingerprints and palmprints, which were made as routine procedure when he was booked, and the shoes he was wearing, which he relinquished the evening of his arrest on December 14. The hair samples and fingernail scrapings were collected two days later.

The trial court, after a hearing, denied the motion to suppress this physical evidence and the defendant's statement.

The defendant first became a suspect when the victim's neighbor told the police the defendant had knocked at her door after midnight the night of the murder. At the time, one of the officers present at this crime-scene interview recalled having talked to the defendant's probation officer, who was looking for him for failing to report to her and for leaving the state, and who wished to swear out a warrant for his arrest when he returned to the state. On that basis, the defendant was arrested on December 14 for violation of probation and taken in

for questioning about the victim's rape and murder.[4] He did not go voluntarily, but was forced to do so when the arresting officer drew his gun. A warrant for violation of probation was issued the next day. On December 19, a warrant for the murder and burglary also was issued, and thereafter the defendant was brought before a magistrate who again advised him of his rights.

Defendant contends that the arresting officer was not authorized by OCGA § 17-4-20 to make a warrantless arrest. He urges that, although an illegal arrest (an arrest without probable cause) does not require his release, *United States v. Crews*, 445 U. S. 463 (100 SC 1244, 63 LE2d 537) (1980); *Lackey v. State*, 246 Ga. 331, 333-334 (271 SE2d 478) (1980), it requires suppression of any physical evidence thereby obtained, *Hayes v. Florida*, 470 U. S. ___ (105 SC 1643, 84 LE2d 705) (1985),[5] and any statement he made as a consequence of such arrest, notwithstanding the giving of the *Miranda* warnings. *Dunaway v. New York*, 442 U. S. 200 (99 SC 2248, 60 LE2d 824) (1979).

OCGA § 17-4-20, formerly Code Ann. § 27-207, authorizes a warrantless arrest by a law enforcement officer "if the offense is committed in his presence or within his immediate knowledge, if the offender is endeavoring to escape, if the officer has probable cause to believe that an act of family violence, as defined in Code Section 19-13-1, has been committed, or for other cause if there is likely to be failure of justice for want of a judicial officer to issue a warrant."

In *Durden v. State*, 250 Ga. 325, 326 (297 SE2d 237) (1982), we pointed out that the standard for a warrantless arrest under the U. S. Constitution is "probable cause," saying: "Under this standard an arrest is constitutionally valid if, at the moment the arrest is made, the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the accused had committed or was committing an offense. *Beck v. Ohio*, 379 U. S. 89, 91 (85 SC 223, 13 LE2d 142) (1964)." In *Durden*, we construed the failure of justice provision of OCGA § 17-4-20, then Code Ann. § 27-

---

[4] The arresting officer testified that he advised the defendant as to his dual purpose in taking the defendant into custody.

[5] In *Hayes v. Florida*, supra, it was made clear that the involuntary removal of a suspect from his home without a warrant and without probable cause, requires suppression of evidence, including fingerprints, subsequently obtained at the police station. In *Hayes*, however, the Court refused to reach the "inevitable discovery" doctrine urged by the State of Florida that the fingerprints would inevitably have been recovered legally and should not be suppressed as the tainted fruit of an illegal arrest. Id. at n. 1. Under that doctrine and its counterpart, the independent source doctrine, see *Nix v. Williams*, 467 U. S. ___ (104 SC 2501, 81 LE2d 377) (1984), there would appear to be no error in the admission into evidence of defendant's fingerprints because they could have been taken at any time and were probably already a matter of police record (the defendant was on probation for burglary).

207, to be the same as the federal requirement, to wit: probable cause, and concluded that "An arrest and search, legal under federal law, are legal under state law." (250 Ga. at 327.)

Defendant urges, however, that the police did not have probable cause for his arrest for murder and burglary, and were not authorized to make a warrantless arrest for violation of probation (the otherwise noncriminal act of leaving the state). OCGA § 42-8-38 (a) provides that "[w]henever, within the period of probation, *a probation supervisor* believes that a probationer under his supervision has violated his probation in a material respect, he may arrest the probationer *without warrant*, wherever found, and return him to the court granting the probation. . . ." (Emphasis supplied.) While acknowledging the right of a probation officer to arrest him without a warrant for a probation violation, the defendant argues that police officers are granted no such authority under this Code section. He urges that police officers may act only under OCGA § 17-4-20, supra.

Here the police officer who made the arrest had trustworthy information that the defendant had violated his probation when he and his girl friend left the state. The officer had been told so not only by the defendant's probation supervisor, but also by the defendant's girl friend's sister. Admitting that the probation supervisor's authority to arrest a probation violator is broader than the general authority of OCGA § 17-4-20, supra, see *Vandiver v. Manning*, 215 Ga. 874, 878 (114 SE2d 121) (1960), we nevertheless see no reason to limit the statutory power to make a warrantless arrest of a known probation violator to the probation supervisor alone and not to include a law enforcement officer with general arrest powers who has trustworthy information as to the probation violation.[6] Thus, we hold the defendant's warrantless arrest for violation of probation by the police officer was valid under state law.

Having determined that there was probable cause to arrest the defendant for violating his probation; i.e., his arrest was not illegal under state or federal law, there was no error in refusing to suppress the defendant's fingerprints, shoes and the statement made that same day. (The statement was exculpatory, albeit not entirely believable.[7]) The other physical evidence — the hair samples and nail scrapings —

---

[6] For example, a law enforcement officer who passes a probation violator on the street should be authorized to make a warrantless arrest even though the parole violation was not a crime per se. We consider the fact that the officer had known of the violation for a considerable time prior to the murder, but did not make the arrest until after the murder, to be immaterial. The defendant does not contend he was arrested in his home in violation of *Payton v. New York*, 445 U. S. 573, 583 (100 SC 1371, 63 LE2d 639) (1980). See also Division 4, infra.

[7] To explain why his clothes were wet, the defendant said that he could not sleep so he stood out in the rain to cool off from the heat, in December.

was collected after the issuance of the probation violation warrant and thus while the defendant was being held under a warrant for probation violation.

There thus remains the defendant's argument that he was not brought before a magistrate within 48 hours of his warrantless arrest, as required by OCGA § 17-4-62. The sanction for violating this statute is that the defendant shall be released. However, noncompliance with this provision does not require suppression of the evidence gathered in the interim. See *Blake v. State*, 109 Ga. App. 636 (3) (137 SE2d 49), cert. denied, 379 U. S. 924 (85 SC 281, 13 LE2d 337) (1964), and cases cited. We decline to extend the exclusionary rule as a sanction to enforce OCGA § 17-4-62.

We thus conclude that the trial court did not err in refusing to suppress the physical evidence or the defendant's statement acquired after his arrest on December 14, 1983.

4. The defendant also argues that the search of his place of abode and seizure of his clothes was illegal and that the fruits of that search, the wet black pants and the dog hair found upon them, should be suppressed. Again, we must disagree.

The apartment was a one-bedroom unit leased to Curtis Edwards, who allowed the defendant to stay with him while he looked for a job. The defendant had shared rent and expenses with him earlier in the year, but had then gone to New York State with his girl friend for several months. Upon their return, Edwards let him stay as a favor and the defendant sometimes slept there on the couch or stayed at his girl friend's apartment. The defendant's clothes were found on a cardboard box kept in Edwards' closet. Edwards had consented to the officers' search of the closet. *United States v. Matlock*, 415 U. S. 164, 172 (94 SC 988, 39 LE2d 242) (1974). We find no error.

5. The defendant next complains that the trial court erred in denying his motions for individual sequestered voir dire. He based his motion on a newspaper article which appeared 11 months before trial, which referred to the possibility that the defendant had shot a laundromat operator the week before the murder. The trial court specifically found that the jurors had indicated positively that they were not prejudiced or biased in the case and we find no abuse of discretion. *Ivester v. State*, 252 Ga. 333, 334 (313 SE2d 674) (1984); *Messer v. State*, 247 Ga. 316, 323 (276 SE2d 15) (1981).

6. The defendant also enumerates as error that the trial court erred in failing to grant his motion for mistrial after "emotional outbursts" by the victim's mother during the prosecutor's opening and closing arguments. The "emotional outbursts" consisted of quiet crying and the trial court found, as to both motions, that the displays of emotion did not interrupt or interfere with the orderly proceedings or attract the attention of the jury. We find no abuse of discretion.

7. We have reviewed the defendant's remaining enumerations and find they present no reversible error.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 5, 1985.

*Paul Fryer, Richard A. Epps,* for appellant.

*J. Brown Moseley, District Attorney, Michael J. Bowers, Attorney General, Dennis R. Dunn, Staff Assistant Attorney General,* for appellee.