## S98P1962. PRUITT v. THE STATE.
### (514 SE2d 639)

SEARS, Justice.

A jury convicted Timothy Woodrow Pruitt of malice murder, felony murder, kidnapping with bodily injury, rape, aggravated sodomy, aggravated child molestation, aggravated assault, aggravated battery, child molestation, and cruelty to children. Pruitt was sentenced to death after the jury found the following statutory aggravating circumstances: the offense of murder was committed while the defendant was engaged in the commission of kidnapping with bodily injury, rape and aggravated battery; the offense of rape was committed while the defendant was engaged in the commission of kidnapping with bodily injury and aggravated battery; the offense of kidnapping with bodily injury was committed while the defendant was engaged in the commission of an aggravated battery; and the offense of murder was outrageously or wantonly vile, horrible, or inhuman, in that it involved torture, depravity of mind and an aggravated battery before death.[1] Pruitt appeals and we affirm.[2]

---

[1] OCGA § 17-10-30 (b) (2), (7).

[2] The crimes occurred on April 10, 1992. Pruitt was indicted on March 3, 1995, and the

1. The evidence shows that in April 1992 Myrtle Ricketts was renting two trailer homes on her property, one to Tammy Lovell and one to Vicky Gottschalk. Ms. Gottschalk lived with her ten-year-old daughter, Wendy Nicole Vincent. Ms. Lovell lived with her two young sons. Pruitt is Lovell's ex-husband and in early April 1992 Lovell and Pruitt were attempting a reconciliation; Pruitt sometimes stayed the night at his ex-wife's trailer.

At about midnight on April 9, 1992, Pruitt arrived at Lovell's trailer. He was drunk and violent and he and Lovell got into an argument. Lovell told him she did not want him there. At about 1:15 a.m., Pruitt angrily left, punching Lovell's porch light as he was leaving and cutting his hand. Pruitt was wearing blue jeans, a flannel shirt, and Reebok tennis shoes. At about the same time, Ms. Gottschalk left her home to work a night shift; her daughter remained sleeping in her trailer. The trailers share a common driveway and Gottschalk had to wait for Pruitt to pull out first. Shortly thereafter, Lovell looked out her window and saw a man she assumed was Pruitt unscrewing the porch light on the Gottschalk trailer. She looked away to attend to a sick child and, when she looked out again, the area was dark.

At about 3:00 a.m., Pruitt entered a convenience store and asked to use the bathroom. The clerk recognized Pruitt because he was a regular customer, but she did not know his name. Pruitt had blood on him, but the clerk testified that this was not unusual because Pruitt was a chicken catcher and chicken catchers usually have blood on them. Pruitt was in the bathroom for about ten minutes, and then left the store. At about 3:45 a.m., Pruitt returned and went back into the bathroom for five minutes. He emerged, stared at the clerk while she helped another customer, and then left. When the clerk checked the bathroom shortly thereafter, paper towels and Comet were strewn about, and the water had been left running. She testified that only Pruitt had used the bathroom since she cleaned it. A friend of

State filed the notice to seek the death penalty on March 13, 1995. The trial took place from September 16 to October 1, 1996. On September 30, 1996, the jury convicted Pruitt of malice murder, felony murder, kidnapping with bodily injury, rape, aggravated sodomy, aggravated child molestation, aggravated battery, aggravated assault, child molestation, and cruelty to children. The jury recommended a death sentence for the murder the following day. The felony murder conviction was vacated by operation of law, *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993), and the trial court merged the convictions of aggravated child molestation, aggravated assault, aggravated battery, and cruelty to children into the other convictions. Pruitt was sentenced to death for malice murder, three life sentences for kidnapping with bodily injury, rape and aggravated sodomy, and twenty years for child molestation, all sentences to be served consecutively. Pruitt filed a motion for new trial on October 29, 1996, and amended it on January 13, 1997. The trial court denied the motion for new trial on February 11, 1997, and this case was docketed on September 9, 1998. The case was orally argued on November 17, 1998.

Pruitt testified that he called her at 3:00 or 3:30 a.m. and told her he needed to talk because he had "done something bad." She told him he could not come over because her child was sick.

Pruitt returned to his ex-wife's trailer and she let him in. He undressed, leaving the clothes he had been wearing in a pile, and showered. At about 6:30 a.m., Ms. Gottschalk returned home and found her daughter lying dead on the bedroom floor. Wendy had been stabbed several times and her throat was cut. The medical examiner also testified that there was trauma to her vagina and anus. Semen stains on the bed indicated that the assault began there and the victim was then moved to the floor and killed. Ms. Gottschalk screamed for help and Pruitt and Lovell came over. Pruitt knelt beside the victim's body and felt for her pulse; he was not wearing the clothes he had worn the night before. Because neither trailer had a phone, Lovell went to Ms. Ricketts's house to call the police. When Lovell and Ricketts returned to the Gottschalk trailer, Ricketts saw Pruitt reach up and screw the porch light bulb until the light came on. She did not see him try the switch first.

The police became suspicious of Pruitt due to the description of his movements during the last few hours, and because he had scratches and cuts on his hands. Lovell consented to a search of her trailer and the police noticed bloodstains on the clothes Pruitt had been wearing the previous night. Pruitt was arrested. A broken window screen at the Gottschalk trailer indicated the assailant's entry point, and beneath the window inside the trailer was a vinyl chair containing a partial shoe print. A State expert determined that this shoe print matched Pruitt's Reeboks.

Type O blood was found on the jeans and shirt that Pruitt had been wearing the night of the murder, and on the steering wheel cover in his car. At the Gottschalk trailer, type A blood was found on the porch light bulb, the screen door latch, and near the entry window. Pruitt is type A and the victim was type O. Inside the victim's bedroom, hairs consistent with Pruitt's head hair were found on the bedroom floor, a bed sheet, a pillow, and the victim's body, panties, socks and shirt. Hairs consistent with Pruitt's pubic hair were found on the bed sheet and the bedroom floor. Fibers found on the bed sheet microscopically matched fibers from the jeans worn by Pruitt the night of the murder. Gottschalk testified that Pruitt had never been a guest in her home; the only time she had ever seen him in her trailer was the brief time he felt for the victim's pulse on the morning of April 10, 1992. Semen was discovered in the victim's anus and DNA extracted from the semen matched Pruitt. The State's DNA expert testified that the frequency of this DNA profile among Caucasians is one in seven billion.

The evidence was sufficient to enable a rational trier of fact to

find Pruitt guilty of the crimes charged beyond a reasonable doubt.[3] The evidence was also sufficient to enable the jury to find the existence of the statutory aggravating circumstances beyond a reasonable doubt.[4]

2. In 1996, the trial court ordered a change of venue from Lumpkin County to Cherokee County. However, pursuant to OCGA § 17-7-150 (a) (3), the trial court ordered that the jury would be selected from Cherokee County, but that the trial would physically take place in Lumpkin County. Pruitt complains that this procedure was found to be reversible error in *Hardwick v. State*.[5] In *Hardwick*, this Court held that Uniform Superior Court Rule 19.2 (B), which provided for the trial of a case in the county of venue with a jury selected from the transfer county, conflicted with OCGA § 17-7-150 (a) and was therefore unenforceable.[6] The Court stated that the General Assembly "would have to enact legislation in order to allow [this venue] procedure."[7] On July 1, 1995, the General Assembly did just that, amending the statute to read, in part: "by the exercise of discretion by the judge the trial jury may be selected from qualified jurors of the transfer county, although the trial of the criminal case may take place in the county of the venue of the alleged crime."[8] The trial court's order therefore does not violate *Hardwick* and, since the statutory amendment shall apply "to all criminal cases in which the county of transfer has not been designated by court order,"[9] the trial court's 1996 venue order was timely. OCGA § 17-7-150 (a) (3) is also not unconstitutional.[10]

3. Pruitt complains that his constitutional right to a speedy trial was violated.[11] He was arrested in April 1992 and not tried until September 1996, and he was incarcerated while awaiting trial. However, the record reveals that much of the delay is attributable to the defense, in that Pruitt repeatedly announced that his experts were not ready for scheduled hearings or trial, and he asked for a delay in the proceedings so that plea negotiations could be conducted. Further, Pruitt did not assert his constitutional right to a speedy trial until May 1996, and he never asserted his statutory right to a speedy

---

[3] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[4] Id.; OCGA § 17-10-35 (c) (2).

[5] 264 Ga. 161, 164-165 (2) (442 SE2d 236) (1994).

[6] Id. at 164.

[7] Id. at 165, n. 7.

[8] OCGA § 17-7-150 (a) (3).

[9] Ga. L. 1995, p. 1302, § 14.

[10] Ga. Const., Art. VI, Sec. II, Par. VIII ("The power to change venue in civil and criminal cases shall be vested in the superior courts to be exercised in such manner as has been, or shall be, provided by law.").

[11] *Barker v. Wingo*, 407 U. S. 514 (92 SC 2182, 33 LE2d 101) (1972); *Brown v. State*, 264 Ga. 803, 804-805 (2) (450 SE2d 821) (1994).

trial.[12] Nor has Pruitt brought forth evidence that the delay impaired his defense.[13] Accordingly, the trial court did not err by denying Pruitt's motion to dismiss for lack of a speedy trial.[14]

4. Before trial, Pruitt moved to exclude the State's DNA evidence as unreliable under *Caldwell v. State*.[15] At a pretrial hearing, the State's DNA experts testified extensively about the DNA testing procedures, probability calculations, precautionary measures, standards, and protocol at the State Crime Lab. Although the defense had its own DNA expert, Pruitt presented no evidence to challenge the methodology of the tests or the results.[16] After viewing the evidence, we conclude that the trial court did not err by ruling that the general scientific principles and techniques involved in the DNA testing were valid and capable of producing reliable results, and that the Crime Lab substantially performed the scientific procedures in an acceptable manner.[17] The DNA evidence was admissible.

5. The indictment was based on legal and sufficient evidence.[18]

6. The Georgia statutes providing for the imposition of the death penalty are not unconstitutional.[19] The Unified Appeal Procedure is also not unconstitutional.[20] Execution by electrocution is not cruel and unusual punishment.[21]

7. There is no evidence that any cognizable group was underrepresented in the Lumpkin County grand jury pool,[22] or that the method of selecting individual grand jurors was improper.

8. After the trial court ordered that the jury would be selected from Cherokee County, Pruitt moved for a continuance and for funds to hire an expert to conduct a study to determine if the opinions of people aged 18-34 differed from the opinions of people aged 35-44 in Cherokee County. The trial court denied the motion for a continuance after finding that Pruitt knew in May 1996 that a demographic study would take eight to ten weeks and that Cherokee County was the transfer county, but waited until July 1996 (eight weeks before trial)

---

[12] See *Brown*, 264 Ga. at 805 (lengthy delay in filing speedy trial demand weighs against the defendant).

[13] See id.

[14] Id.

[15] 260 Ga. 278 (393 SE2d 436) (1990).

[16] See *Caldwell*, 260 Ga. at 290 (1) (f); *Morris v. State*, 212 Ga. App. 42, 42-43 (1) (441 SE2d 273) (1994).

[17] *Caldwell*, 260 Ga. at 286-287 (1) (b); *Johnson v. State*, 265 Ga. 668, 669 (2) (461 SE2d 209) (1995).

[18] See *Felker v. State*, 252 Ga. 351, 366 (2) (a) (314 SE2d 621) (1984).

[19] *McMichen v. State*, 265 Ga. 598, 611 (25) (458 SE2d 833) (1995).

[20] *Wellons v. State*, 266 Ga. 77, 91 (33) (463 SE2d 868) (1995).

[21] Id. at 91 (32).

[22] See *Bright v. State*, 265 Ga. 265, 283 (12) (455 SE2d 37) (1995); *Hicks v. State*, 256 Ga. 715, 718 (7) (352 SE2d 762) (1987).

to request a continuance to conduct the study. As a motion for expert assistance must be timely, we conclude that the trial court's denial of the continuance was not error.[23] In addition, the denial of funds to hire the expert was not an abuse of discretion because, since there was no evidence that young people were systematically excluded from the traverse jury pool in Cherokee County, Pruitt failed to show why such a study was critical to his defense.[24] " 'The granting or denial of a motion for appointment of expert witnesses lies within the sound discretion of the trial court.' "[25] We find no error.

9. The death qualification of prospective jurors is not unconstitutional.[26]

10. The trial court did not err by asking the OCGA § 15-12-164 voir dire questions to the prospective jurors. Pruitt lacks standing to challenge the constitutionality of the OCGA § 15-12-164 (a) (4) question regarding conscientious objection to the death penalty because "[t]he death qualification voir dire in this case was more extensive and detailed than that provided by OCGA § 15-12-164 (a) (4) and the record indicates that no potential juror was excused from serving or declared competent to serve based solely on his or her answer to the (a) (4) statutory question."[27]

11. Pruitt complains that the trial court improperly restricted his voir dire of prospective jurors. We disagree. "The scope of voir dire is largely left to the trial court's discretion, and the voir dire in this case was broad enough to ascertain the fairness and impartiality of the prospective jurors."[28]

12. "The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment 'is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "[29] "The relevant inquiry on appeal is whether the trial court's finding that a prospective juror is [or is not] disqualified is supported by the record as a whole."[30] A trial court's finding that a prospective juror is or is not disqualified, including the trial court's resolution of any equivocations or conflicts in the prospective juror's

[23] See *Battle v. State*, 254 Ga. 666, 668-669 (2) (333 SE2d 599) (1985).

[24] See *Henry v. State*, 265 Ga. 732, 734-735 (3) (a), (b) (462 SE2d 737) (1995); *Mobley v. State*, 265 Ga. 292, 294-295 (6) (455 SE2d 61) (1995).

[25] *Henry*, 265 Ga. at 735 (3) (b), quoting *Roseboro v. State*, 258 Ga. 39 (3) (a) (365 SE2d 115) (1988).

[26] *DeYoung v. State*, 268 Ga. 780, 790 (11) (493 SE2d 157) (1997).

[27] *Jenkins v. State*, 269 Ga. 282 (7) (498 SE2d 502) (1998).

[28] *Barnes v. State*, 269 Ga. 345, 351-352 (10) (496 SE2d 674) (1998).

[29] *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997), quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985).

[30] *Greene*, 268 Ga. at 49.

responses, is given deference by an appellate court.[31] "Whether to strike a juror for cause is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of discretion."[32]

There are three prospective jurors Pruitt claims should have been excused for cause due to their responses regarding the death penalty. Although all three prospective jurors expressed a strong preference for the death penalty, they also stated that they could consider all the circumstances and both life and death as possible sentences. Viewing the record as a whole and giving deference to the trial court, we cannot conclude that the trial court abused its discretion in qualifying these prospective jurors.[33] Pruitt also objects to the disqualification of four prospective jurors due to their opposition to the death penalty. The record reveals that these jurors all firmly and unequivocally stated that they could not vote to impose a death sentence under any circumstances. Therefore, the trial court did not abuse its discretion by excusing these jurors for cause.[34]

13. Pruitt complains about another prospective juror who was excused for cause. That juror stated that the legal system was unfair because he believed that his brother had been convicted in an unfair trial where witnesses had lied. He said he did not think he could lay aside the bias he felt against the State, and that he might hold the State to a higher burden of proof. "Whether to strike a juror for cause lies within the sound discretion of the trial court,"[35] and we cannot conclude that the trial abused its discretion in excusing this juror.

14. The written list of alleged statutory aggravating circumstances was properly sent out with the jury in accordance with OCGA § 17-10-30 (c).[36] It was also not error for the trial court to decline to send a written copy of the court's charge out with the jury.[37]

15. Pruitt claims that the trial court erred in denying his motion to suppress the out-of-court identification evidence because Shirley Roach, the convenience store clerk who identified Pruitt, was subjected to an impermissibly suggestive photo lineup.[38] Although there was conflicting evidence about how the lineup was conducted and there was evidence that Ms. Roach saw Pruitt's photograph in the newspaper before the lineup, we conclude that there was no substan-

---

[31] Id.

[32] Id. at 50.

[33] See *Greene*, 268 Ga. at 49-50.

[34] Id.

[35] *Brown v. State*, 268 Ga. 354, 356 (3) (490 SE2d 75) (1997).

[36] *Spraggins v. State*, 243 Ga. 73, 74-75 (2) (252 SE2d 620) (1979).

[37] *Mulligan v. State*, 245 Ga. 266, 270 (4) (264 SE2d 204) (1980).

[38] *Neil v. Biggers*, 409 U. S. 188, 198-199 (III) (93 SC 375, 34 LE2d 401) (1972); *Thomason v. State*, 268 Ga. 298, 303-305 (3) (486 SE2d 861) (1997).

tial likelihood of misidentification.[39] Ms. Roach repeatedly and unequivocally testified that Pruitt was a regular customer who had been in her store many times, and that she recognized his face but did not know his name. She knew that he was employed as a chicken catcher, and even remembered that he used to come into her store with his father. She testified that she did not base her identification on the photos because, "I already knew him from the store before. I didn't need to see no picture." She also had reason to remember that he was in her store on the night of the murder because he messed up the bathroom she had just cleaned.[40]

16. Pruitt's contention that the shoe print comparison evidence was unreliable and should have been suppressed is without merit.[41] The warrantless seizure of Pruitt's shoes, which he was wearing when he was arrested, was proper.[42]

17. Pruitt complains that the trial court erred by denying his motion for adequate compensation of counsel. "However, because there is not any proof that the alleged inadequate compensation of counsel denied [Pruitt] effective assistance of counsel, the attorney fee issue is not properly before us."[43]

18. In August 1995, thirteen months before trial, the trial court learned that the district attorney had hired Pruitt's lead counsel, Robert Chandler, the previous month to represent him in an unrelated personal matter. There is no evidence that the district attorney intended to interfere with Pruitt's representation when he hired Chandler. Although Chandler stated that his representation of the district attorney would have no effect on his representation of Pruitt, the trial court determined that this relationship constituted a conflict. The trial court appointed independent counsel to advise Pruitt, and a hearing pursuant to *United States v. Garcia*[44] was held in October 1995. At the *Garcia* hearing, Pruitt was extensively advised about his Sixth Amendment right to conflict-free representation, and questioned at length about his understanding of this right. Pruitt waived his right to conflict-free representation. However, in January 1996, Pruitt changed his mind, and the trial court removed Chandler. In March 1996, the trial court appointed new lead counsel for Pruitt.

Pruitt complains that the hiring of his original lead counsel by the district attorney caused an irreconcilable conflict, and therefore

---

[39] See *Thomason*, supra at 304-305.

[40] Id.

[41] See *Cromartie v. State*, 270 Ga. 780 (18) (514 SE2d 205) (1999).

[42] *Batton v. State*, 260 Ga. 127, 130 (3) (391 SE2d 914) (1990) (warrantless seizure of shoes worn by defendant when arrested is proper as a search incident to arrest).

[43] *Brown v. State*, 266 Ga. 633, 636 (3) (469 SE2d 186) (1996).

[44] 517 F2d 272 (5th Cir. 1975). See also *Redd v. State*, 264 Ga. 399, 399-400 (444 SE2d 776) (1994).

reversible error, because it led to his counsel's disqualification. The concurrent representation of a defendant in a capital case and the district attorney seeking the death penalty against the defendant is an obvious conflict.[45] However, without addressing the issue of waiver, we conclude that Pruitt does not show any harm resulting from this simultaneous representation. The conflict was resolved in January 1996 when the trial court removed Chandler, at the defendant's request. New lead counsel was appointed for Pruitt six months before trial, and Pruitt had the same co-counsel throughout his case. There is no evidence that Chandler's performance was affected during the simultaneous representation, or that his removal affected Pruitt's representation at trial. In order to prevail on this claim, Pruitt must show the existence of an actual conflict of interest that adversely affected his lawyer's performance.[46] Because Pruitt does not show that the representation he received was deficient in any respect, we find no error.[47]

19. Based on Chandler's representation of the district attorney outlined in the previous enumeration, Pruitt moved to disqualify the district attorney due to conflict of interest and appearance of impropriety. While we do not condone the actions of the district attorney, this is not a situation where the prosecutor previously represented the defendant, and there is no evidence that the district attorney gained any information about Pruitt's defense through his personal retention of one of Pruitt's attorneys.[48] In fact, Pruitt does not allege that Chandler divulged any information acquired in the representation of Pruitt to the district attorney, or that Chandler assisted the prosecution in any way. Therefore, we find no error in the denial of the motion to disqualify the district attorney.

20. The district attorney agreed to a consent order that opened his file to the defense, and he announced at a pretrial hearing that the defendant had been provided with everything in the file, except for work product. About three weeks before trial, the district attorney

---

[45] See generally *Sallie v. State*, 269 Ga. 446 (499 SE2d 897) (1998); *Chapel v. State*, 264 Ga. 267 (443 SE2d 271) (1994); *Fleming v. State*, 246 Ga. 90 (270 SE2d 185) (1980).

[46] *Cuyler v. Sullivan*, 446 U. S. 335, 348 (100 SC 1708, 64 LE2d 333) (1980); *Lamb v. State*, 267 Ga. 41, 42 (1) (472 SE2d 683) (1996).

[47] *Lamb*, 267 Ga. at 42-43.

[48] See *Chapel*, 264 Ga. 267 (attorney disqualified from representing capital defendant due to appearance of impropriety resulting from simultaneous employment by the county in which defendant was being prosecuted); *Williams v. State*, 258 Ga. 305, 314 (2) (B) (369 SE2d 232) (1988) (A conflict of interest arises where the prosecutor has previously represented the defendant with respect to the charged offense, or consulted with the defendant about the charged offense, or acquired a personal interest or stake in the outcome of the prosecution.); *Davenport v. State*, 157 Ga. App. 704, 705-706 (278 SE2d 440) (1981) (appearance of impropriety where district attorney represented a husband in a divorce action at the same time he was participating in the prosecution of the wife for shooting the husband).

discovered a box of material gathered during the investigation of the case and turned it over to the defense. Pruitt claims prosecutorial misconduct in the failure of the State to provide this material until the eve of trial. The record reveals that this box was misplaced, and promptly turned over to the defense when discovered. Moreover, the record shows that the box was probably misplaced because it contained material that had been deemed worthless to the investigation, such as soda cans taken from the crime scene, a mold of Pruitt's teeth, the original affidavits for the search warrants, a knife sheath, a flashlight taken from Pruitt's ex-wife's car, and statements from EMTs who arrived at the crime scene. Pruitt does not allege that there was any evidence beneficial to the defense in this box, and nothing in the box was used by the State at trial. As there is no evidence that the State deliberately withheld evidence or that Pruitt was harmed by the late disclosure of the box, we conclude that Pruitt was not denied a fair trial due to prosecutorial misconduct.[49]

21. Pruitt asserts that the trial court erred by refusing to allow questioning of a State witness about a prior incident. Investigator Steven Hawk of the Lumpkin County sheriff's office was the chief investigator on Pruitt's case and the evidence custodian. In February 1993, ten months after the murder, while working as a patrol sergeant with the Oakwood Police Department, Hawk pulled over a woman for suspected DUI and took her to the police station. Hawk allowed the woman to make a phone call, and she called her brother, a GBI agent. The GBI agent asked Hawk for a favor (without further specification), and Hawk allowed the woman's sober boyfriend to blow into the intoxilyzer for her. He also prepared a nolle prosequi recommendation. When the police chief learned of this incident, he requested Hawk's resignation and Hawk resigned. At trial, Pruitt wanted to question Hawk about this incident, claiming that it was relevant to show that he may have tampered with evidence in the murder case. However, the DUI case was wholly unrelated to Pruitt's case; questioning about this incident was obviously and solely intended to diminish Hawk's credibility as a witness. Hawk was not convicted of any crime in the DUI incident, and impeaching a witness with specific acts of bad character is not permissible.[50] Therefore, the trial court did not err by preventing questions about the DUI incident.[51]

---

[49] See *Roberts v. State*, 267 Ga. 669, 671-672 (3) (482 SE2d 245) (1997).

[50] OCGA § 24-9-84; *Henry v. State*, 269 Ga. 851, 856 (5) (507 SE2d 419) (1998); *Wetta v. State*, 217 Ga. App. 128, 130 (3) (456 SE2d 696) (1995).

[51] Although it is conceivable that a proper foundation could be laid that would render such evidence indirectly material to a case, see Milich, *Georgia Law of Evidence*, § 14.1, pp. 183-184 (1995), the facts of this case do not present such an issue.

22. While the jury was eating a meal during the guilt-innocence phase, the assistant manager of the restaurant entered their private dining area and said, "He is not guilty." The bailiffs removed him. Upon notification of this incident, the trial court questioned each juror. Every juror had heard the improper comment, but all stated that they felt the comment was inappropriate and that it would not affect their ability to be impartial. The jurors also stated that there had been some discussion about the stupidity of the man who had made the comment, but there had been no discussion about the merits of the case. The trial court instructed each juror on the presumption of innocence and the burden of proof. When there is an improper communication to a juror, there is a presumption of harm and the burden is on the State to show the lack thereof.[52] "However, where the substance of the communication is established without contradiction, the facts themselves may establish the lack of prejudice or harm to the defendant."[53] The evidence establishes that the improper communication in this case did not affect the impartiality of the jurors, and the trial court therefore did not err by denying Pruitt's motion for mistrial.

23. Pruitt claims that the jury saw him outside the courtroom in shackles. When the defendant was being escorted from the jail to the courtroom one morning, a van carrying the jurors drove by. However, Pruitt was only a few feet outside the doorway of the jail, and the sheriff saw the van coming and stepped in front of Pruitt to obscure him. The trial court questioned each juror and it is clear that no juror saw the defendant that morning.[54] Therefore, this contention is without merit.[55]

24. The admission of pre-autopsy photographs of the victim was not error.[56]

25. The arrest warrant was valid.[57]

26. Pruitt claims that the trial court erred by denying his motion to suppress the evidence seized from his ex-wife's trailer because his ex-wife did not give a valid consent to search. However, Tammy Lovell testified that she consented to a search of her trailer, telling the officer to "go ahead," and that she was not coerced or threatened in any way. Viewing the totality of the circumstances, the consent to search was valid.[58]

---

[52] *Jones v. State*, 258 Ga. 96, 96-97 (366 SE2d 144) (1988).
[53] Id.
[54] See *Anderson v. State*, 258 Ga. 70, 73 (12) (365 SE2d 421) (1988).
[55] Id.
[56] *Bright v. State*, 265 Ga. at 284 (16); *Osborne v. State*, 263 Ga. 214, 215 (2) (430 SE2d 576) (1993).
[57] OCGA § 17-4-41.
[58] See *Raulerson v. State*, 268 Ga. 623, 625 (2) (a) (491 SE2d 791) (1997).

27. Pruitt complains that the trial court erred by denying his motion for a psychological evaluation during the trial. At the beginning of the sentencing phase, Pruitt's counsel requested a psychological examination for their client. They stated that Pruitt was acting irrationally, but the trial court determined that the sole basis for this claim was that Pruitt told his counsel after conviction that he preferred a death sentence and would not testify in mitigation. Upon questioning by the trial court, Pruitt stated that he understood his decision, and knew his right to testify and present mitigation evidence. The trial court noted there had never been any indication that Pruitt was incompetent or had mental problems, and it found that Pruitt's decision was made knowingly and intelligently. After having been informed, a competent defendant, and not his counsel, makes the ultimate decision about whether to testify or present mitigation evidence.[59] We conclude that the trial court did not err by denying the motion for a psychological examination during the trial.[60]

28. The death sentence in this case was not imposed under the influence of passion, prejudice, or other arbitrary factor.[61] The death sentence is also not disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant.[62] The cases listed in the Appendix support the imposition of the death penalty in this case as they involve a deliberate murder during the commission of a rape or kidnapping with bodily injury.

*Judgment affirmed. All the Justices concur.*

### APPENDIX.

*Pye v. State*, 269 Ga. 779 (505 SE2d 4) (1998); *Wellons v. State*, 266 Ga. 77 (463 SE2d 868) (1995); *Williams v. State*, 258 Ga. 281 (368 SE2d 742) (1988); *Blankenship v. State*, 258 Ga. 43 (365 SE2d 265) (1988); *Lipham v. State*, 257 Ga. 808 (364 SE2d 840) (1988); *Parker v. State*, 256 Ga. 543 (350 SE2d 570) (1986); *Ford v. State*, 255 Ga. 81 (335 SE2d 567) (1985); *Ross v. State*, 254 Ga. 22 (326 SE2d 194) (1985); *Allen v. State*, 253 Ga. 390 (321 SE2d 710) (1984); *Justus v. State*, 247 Ga. 276 (276 SE2d 242) (1981); *Thomas v. State*, 247 Ga. 233 (275 SE2d 318) (1981).

---

[59] *Morrison v. State*, 258 Ga. 683, 686 (3) (373 SE2d 506) (1988).
[60] Some mitigation evidence was presented in the sentencing phase.
[61] OCGA § 17-10-35 (c) (1).
[62] OCGA § 17-10-35 (c) (3).

DECIDED MARCH 19, 1999 —
RECONSIDERATION DENIED APRIL 1, 1999.

*Whelchel & Dunlap, Thomas M. Cole, Summer & Summer, Chandelle T. Summer, Valpey & Walker, Gregory W. Valpey,* for appellant.

*Darrell E. Wilson, District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Beth A. Burton, Assistant Attorney General,* for appellee.