S01A1041. DAWSON v. THE STATE.
S01A1210. MOORE v. THE STATE.
(554 SE2d 137)

HUNSTEIN, Justice.

The State is seeking the death penalty against Timothy Carl Dawson, who has been charged with four murders and numerous other crimes in Fulton County, and against Carzell Moore, in his new sentencing trial following his conviction for the 1976 murder and rape of Teresa Allen in Monroe County. See *Moore v. State*, 240 Ga. 807 (243 SE2d 1) (1978). Challenges were raised in both cases to the State's use of electrocution as the method of executing persons sentenced to death for capital offenses in Georgia. The trial court in Dawson's case found that the use of electrocution violates the State and Federal Constitutions; the trial court in Moore's case upheld the constitutionality of the use of electrocution. This Court granted Dawson and Moore's applications for interim review, consolidated the cases, and directed the parties to address whether electrocution

remains a constitutional method of execution in Georgia. Upon considered review of this difficult issue, we conclude that future use of electrocution as a means of executing death sentences in Georgia would violate the prohibition against cruel and unusual punishment in Art. I, Sec. I, Par. XVII of the Georgia Constitution. Therefore, we direct that any future executions of death sentences in Georgia be carried out by lethal injection in accordance with OCGA § 17-10-38, as amended.

1. Both the Georgia Constitution and the Constitution of the United States proscribe punishments that are "cruel and unusual." U. S. Const., Amend. VIII; Ga. Const. of 1983, Art. I, Sec. I, Par. XVII. Long before the Eighth Amendment to the United States Constitution came to be recognized as fully applicable, through the Fourteenth Amendment, to states' powers to punish their own citizens, see *Robinson v. California,* 370 U. S. 660, 667 (82 SC 1417, 8 LE2d 758) (1962), Georgia constitutional law proscribed this State's use of cruel and unusual punishments. Ga. Const. 1861, Art. I, Sec. 4901. Thus, while this Court consults decisions interpreting the Eighth Amendment to the Federal Constitution and must give full effect to that Amendment, this Court has recognized that "Federal constitutional standards represent the minimum, not the maximum, protection that this state must afford its citizens [cit.]," *Fleming v. Zant,* 259 Ga. 687, 690 (3) (386 SE2d 339) (1989), and we have explicitly held that in interpreting the prohibition against cruel and unusual punishment found in the Georgia Constitution, the applicable standard is "the standard of the people of Georgia, not the national standard." Id.

2. The people of Georgia, through their elected representatives, have chosen electrocution as the method of executing persons sentenced to death for capital offenses committed before May 1, 2000. Ga. L. 2000, p. 947, § 1. See OCGA § 17-10-38. We operate from the presumption that this method of execution is constitutional. See *Miller v. State,* 266 Ga. 850 (2) (472 SE2d 74) (1996) (statutes are presumed constitutional). That presumption of constitutionality, however, cannot prevail when a statute manifestly infringes upon a constitutional provision or violates the rights of the people. Id. Thus, the mere fact that the Legislature has spoken on the issue of the method of execution does not preclude or in any manner limit this Court's evaluation of the selected method to determine whether it comports with the constitutional prohibition against cruel and unusual punishment. See *Lambeth v. State,* 257 Ga. 15, 16 (354 SE2d 144) (1987). See also *Weems v. United States,* 217 U. S. 349, 379 (30 SC 544, 54 LE 793) (1910) (legislatively-prescribed punishments "have no limitation . . . but constitutional ones, and what those are the judiciary must judge").

Similarly, prior rulings by this Court regarding the constitutionality of the use of electrocution cannot be deemed determinative of the issue. This Court has acknowledged that "whether a particular punishment is cruel and unusual is not a static concept, but instead changes in recognition of the ' "evolving standards of decency that mark the progress of a maturing society." ' [Cit.]" *Fleming v. Zant*, supra, 259 Ga. at 689 (1). As noted by the United States Supreme Court in addressing the scope of the Eighth Amendment's prohibition against cruel and unusual punishments, "if we are to attribute an intelligent providence to its advocates we cannot think that it was intended to prohibit only practices like the Stuarts, or to prevent only an exact repetition of history." *Weems v. United States*, supra, 217 U. S. at 373.

> Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, "designed to approach immortality as nearly as human institutions can approach it." The future is their care, and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be.

Id.

In OCGA § 17-10-38, as amended, the Legislature also contemplated "what may be," id., when it recognized the possibility that this Court would find unconstitutional its retention of electrocution as the method of executing persons sentenced to death for capital offenses committed before that statute's effective date. In anticipation of such a ruling and with full awareness of the disfavor into which death by electrocution has fallen,[1] the Legislature made express provisions in the uncodified section of OCGA § 17-10-38. It specifically stated that

> [i]t is the further intention of the General Assembly that persons sentenced to death for crimes committed prior to the

---

[1] See Rebecca Brannan, Peach Sheet, Sentence and Punishment: Change Method of Executing Individuals Convicted of Capital Crimes from Electrocution to Lethal Injection, 17 Ga. St. L. Rev. 116 (2000). See also *Esposito v. State*, 273 Ga. 183 (3) (a) (538 SE2d 55) (2000).

effective date of this Act be executed by lethal injection if the Supreme Court of the United States declares that electrocution violates the Constitution of the United States or if the Supreme Court of Georgia declares that electrocution violates the Constitution of the United States or the Constitution of Georgia.

Ga. L. 2000, p. 947, § 1. See also id. at § 6, holding that lethal injection shall apply to persons sentenced to death for crimes committed prior to May 1, 2000 in the event electrocution is declared unconstitutional by this Court or the U. S. Supreme Court. Compare Ohio Rev. Code Ann. § 2949.22 (E) (providing in regard to the amendment allowing condemned prisoners to elect lethal injection that "[n]o change in the law made by this amendment constitutes a declaration by or belief of the general assembly that execution of a death sentence by electrocution is a cruel and unusual punishment proscribed by the Ohio Constitution or the United States Constitution").

3. Our reevaluation of the constitutionality of electrocution as a method of execution in Georgia is influenced greatly by the enactment of the amended version of OCGA § 17-10-38. That statute represents "the clearest and most objective evidence of how contemporary society views a particular punishment" inasmuch as that significant change in the law "amount[s] to evidence of the shifting or evolution of the societal consensus." *Fleming v. Zant*, supra, 259 Ga. at 689-690 (3). We note that while several death penalty cases have come before this Court since this significant change in the law, those cases have failed to offer the Court an opportunity to consider the question of the continued constitutionality of electrocution on the footing presented by the case before us now. Several recent cases challenging electrocution involved motions which were unsupported by admissible evidence or which proffered evidence that was not actually made part of the record placed before this Court. See, e.g., *Colwell v. State*, 273 Ga. 634, 640 (6) (544 SE2d 120) (2001) ("[i]n the absence of admissible evidence demanding a different result, the trial court did not err in declining to declare execution by electrocution unconstitutional"); *Esposito v. State*, 273 Ga. 183 (3) (b) (538 SE2d 55) (2000). But see *Heidler v. State*, 273 Ga. 54 (25) (537 SE2d 44) (2000) (declining to reverse where the trial court denied a request for an evidentiary hearing prior to April 27, 2000). In many of the recent cases, however, the issue of electrocution was not raised on appeal, had been waived at trial, or was procedurally barred. See *Presnell v. State*, 274 Ga. 246 (551 SE2d 723) (2001); *Fults v. State*, 274 Ga. 82 (548 SE2d 315) (2001) (issue not raised); *Butts v. State*, 273 Ga. 760 (31) (546 SE2d 472) (2001); *Head v. Carr*, 273 Ga. 613 (2) (544 SE2d 409) (2001); *Davis v. Turpin*, 273 Ga. 244 (1) (539 SE2d

129) (2000); *Jones v. State*, 273 Ga. 231 (539 SE2d 154) (2000). In contrast to those earlier cases, the consolidated appeals in this case involve evidence which was both admitted by the two trial courts and considered by those courts in light of the recent legislative changes in Georgia's death penalty laws. Accordingly, we consider the issue to be properly before this Court and ready for review.

4. (a) The trial court in Moore's case had before it testimony from defense experts, State experts, electrocution survivors, and prison officials, as well as autopsy reports prepared by the State after Georgia executions, audiotapes archiving Georgia executions, post-mortem photographs of persons executed in Georgia, and Georgia protocols for execution by electrocution and by lethal injection. A defense expert testified that there is a possibility, even a likelihood, that Georgia's electric chair does not produce instantaneous unconsciousness. He asserted that although very high voltage is applied in the first two portions of the three-stage, two-minute electrocution process, the brain is shielded from much of the electricity by the skull. The defense expert further claimed that the alternating current used in electrocutions could repetitively activate the brain, causing the perception of excruciating pain and a sense of extreme horror. Another defense expert testified that the two high-voltage portions of the electrocution process, which last a total of eleven seconds, would induce cardiac standstill but that the third, low-voltage portion of the electrocution process, which lasts 109 seconds, might fail to produce its designed effect of inducing ventricular fibrillation in half of all executions.

In two instances documented by prison officials as a record of Georgia executions, a second two-minute cycle of electricity was required due to life signs exhibited by the prisoner. In one case, breathing was observed during the five-minute "cooling off" period following the initial two-minute application of electricity, thus requiring the application of another two-minute cycle of electricity. In another case, the prisoner was observed bobbing his head from side to side during both the low-voltage portion of the first two-minute electrocution cycle and the five-minute lapse period that followed.[2] The physicians who examined the prisoner during the first five-minute lapse period determined that he was still breathing. Although the prisoner stopped moving his head when the second cycle of electricity was initiated, the head movements resumed and he appeared to be breathing during both the final portion of the second electrocution cycle and during the first two minutes of the second

---

[2] A defense expert testified that because the human autonomic nervous system does not make the head bob from side to side, this movement indicated it was carried out by a conscious individual.

cooling-off period.

The autopsy reports and autopsy photographs prepared as part of the State's execution protocol establish that some degree of burning of the prisoner's body is present in every electrocution.[3] The autopsy reports contain repeated comments to the effect that the burns found on the deceased prisoners are "characteristic" or "typical" of injuries observed in previous executions, and there are references to blisters and burn marks observed on other places on the bodies. The autopsies also reference the sloughing or "slippage" of a large portion of the scalp and the skin at the back of the head and also on the legs caused by the execution.

The State presented expert testimony suggesting that Georgia's electrocution protocol results in immediate unconsciousness upon the initial application of electricity and that this unconsciousness continues throughout the execution process. Two of the State's experts testified that, while cardiac functioning is affected by the electricity, the primary mechanism of death in Georgia executions by electrocution is the "denaturing" or cooking of the brain from the heat created by the passing of electricity through the electrical resistance of the brain tissue.[4] One expert testified about post-execution tests which showed that the brain reached temperatures between 135 to 145 degrees Fahrenheit. The other expert acknowledged that a person might retain sufficient functioning in the deepest part of the brain that controls basic life functions to continue some breathing or agonal gasps after the two-minute cycle of electricity has ended. The State adduced testimony from a victim of a lightning strike and a victim of an accidental electrocution that suggested those non-lethal electrocutions had been painless at the moment they occurred. The State also presented testimony from witnesses to several Georgia executions who saw prisoners during electrocutions clenching fists, tightening muscles, and straining involuntarily against the restraints. No evidence was presented which indicated that a Georgia execution has yet involved the sparks, flames, and smoke that have plagued executions by electrocution outside of Georgia. See *Jones v. Butterworth*, 701 So.2d 76, 86-87 (II) (Fla. 1997) (Shaw, J., dissenting); *Buenoano v. State*, 565 So.2d 309, 310-311, 314 (Fla. 1990) (per curiam).

The trial court in Moore's case, confronted with conflicting

---

[3] The documents, produced in response to a defense subpoena, include the autopsy reports on 20 of the 23 men who have died by State-imposed electrocution in Georgia since the reinstatement of the death penalty. See *Gregg v. Georgia*, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976).

[4] The State's remaining expert gave testimony consistent with the other witnesses in that he explained that the brain is "destroyed" by the electrical current and that in the absence of a functioning brain, the other functions of the body would cease.

expert testimony, was unable to conclude whether or not execution by electrocution inflicts conscious suffering. It found instead that "[a]ll the evidence is subject to conjecture and speculation."

(b) The trial court in Dawson's case agreed to consider transcripts, depositions, affidavits, and documentary materials copied from other cases in Georgia wherein challenges to electrocution had been raised. The court also considered audiotapes archiving Georgia executions. The State declined the trial court's invitation to present evidence in Dawson's case, relying, instead, solely upon this Court's previous decisions on the constitutionality of execution by electrocution. Based on the evidence before it, the trial court found that electrocution involves lingering death, bodily mutilation and physical violence indicative of inhumanity and barbarity. After the court had issued its ruling on electrocution, the State raised a number of objections to the materials considered by the trial court and sought to introduce its own evidence. The State raises similar objections before this Court in this interim review. However, we do not reach those objections because, in this Court's view, the materials in the Dawson record are merely cumulative to the evidence and testimony in Moore's case upon which this Court more directly relies.

5. The United States Supreme Court has recognized that punishment is cruel and unusual when it unnecessarily involves "something more than the mere extinguishment of life." *In re Kemmler*, 136 U. S. 436, 447 (10 SC 930, 34 LE 519) (1890). "The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence." *Louisiana ex rel. Francis v. Resweber*, 329 U. S. 459, 463 (67 SC 374, 91 LE 422) (1947) (plurality opinion). This Court relied upon the Federal standard for examining a punishment when addressing a challenge under the Georgia Constitution in *Fleming v. Zant*, supra, 259 Ga. at 689 (3). We held therein that a punishment is cruel and unusual if it "makes no measurable contribution to accepted goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering." (Citations and punctuation omitted.) Id.

Based on the findings made in these consolidated cases and giving greater weight to the Moore court because it found in favor of the constitutionality of death by electrocution, the evidence establishes that it is not possible to determine conclusively whether unnecessary pain is inflicted in the execution of the death sentence. The absence of a conclusive finding of conscious pain does not conclude our review, however, since under Georgia's standard our focus is not limited to the issue of the unnecessary conscious pain suffered by the condemned prisoner. Compare *Fierro v. Gomez*, 77 F3d 301 (B) (2) (9th Cir. 1996), vacated on other grounds, *Gomez v. Fierro*, 519 U. S. 918 (117 SC 285, 136 LE2d 204) (1996); *Campbell v. Wood*, 18 F3d 662,

681 (VII) (B) (1) (9th Cir. 1994). Such a limited focus would lead to the abhorrent situation where a condemned prisoner could be burned at the stake or crucified as long as he or she were rendered incapable by medication of consciously experiencing the pain, even though such punishments have long been recognized as "manifestly cruel and unusual." *In re Kemmler*, supra, 136 U. S. at 446.

We cannot ignore the cruelty inherent in punishments that unnecessarily mutilate or disfigure the condemned prisoner's body or the unusualness that mutilation creates in light of viable alternatives which minimize or eliminate the pain and/or mutilation. Although the Fourth Circuit Court of Appeals has posited that the "existence and adoption of more humane methods [of execution] does not *automatically* render a contested method cruel and unusual," (emphasis supplied), *Hunt v. Nuth*, 57 F3d 1327, 1338 (4th Cir. 1995), the fact that a method involving less pain and mutilation exists and that many states have moved to that method because it is perceived to be a more humane manner of execution, id. at 1338 fn. 16, clearly must play an important factor in the determination whether an older method is cruel and unusual punishment. Comparison with existing methods is thus required to determine whether or not a punishment involves the "unnecessary cruelty" forbidden by both the Eighth Amendment, *In re Kemmler*, supra, 136 U. S. at 447, and the Georgia Constitution, since it is not possible to determine whether a punishment has been "reduced, *as nearly as possible*, to no more than that of death itself," (emphasis supplied), *Louisiana ex rel. Francis v. Resweber*, supra, 329 U. S. at 474 (Burton, J., dissenting), without comparing the punishment to other available methods to ascertain what currently *is* possible.

The evidence adduced in the record in Moore reveals uncontrovertedly that the bodies of condemned prisoners in Georgia are mutilated during the electrocution process.[5] This applies whether or not the electrocution protocols are correctly followed and the electrocution equipment functions properly. The autopsy reports show that the bodies are burned and blistered with frequent skin slippage from the process, and the State's experts concur that the brains of the condemned prisoners are destroyed in a process that cooks them at temperatures between 135 and 145 degrees Fahrenheit. This evidence, gathered by the State's own agents or acknowledged by the State's own experts, establishes the mutilating effects of electrocution. This is in contrast with evidence before the Moore trial court regarding

---

[5] Although appellants rely in large part on evidence regarding executions in other jurisdictions, we do not find it necessary to address the relevancy of such evidence or the differences in protocols and equipment which may distinguish such evidence. Our holding is thus based solely upon evidence derived from Georgia executions.

death by lethal injection[6] which was shown to involve a minimally intrusive procedure which does not produce the mutilation which is a necessary by-product of death by electrocution.

Based on this evidence of the electrocution process and comparing that process with lethal injection, a method of execution the Legislature has now made available in this State, we conclude that death by electrocution involves more than the "mere extinguishment of life," *In re Kemmler*, supra, 136 U. S. at 447, and inflicts purposeless physical violence and needless mutilation that makes no measurable contribution to accepted goals of punishment. *Fleming v. Zant*, supra, 259 Ga. at 689 (3). Accordingly, we hold that death by electrocution, with its specter of excruciating pain and its certainty of cooked brains and blistered bodies, violates the prohibition against cruel and unusual punishment in Art. I, Sec. I, Par. XVII of the Georgia Constitution.

While cognizant of Justice Frankfurter's admonition that judges must "be on guard against finding in personal disapproval a reflection of more or less prevailing condemnation," *Louisiana ex rel. Francis v. Resweber*, supra, 329 U. S. at 471 (Frankfurter, J., concurring), this Court's determination that electrocution is a cruel and unusual method of punishment is founded securely upon clear and objective evidence in the form of our State Legislature's action in totally abolishing electrocution as a method of extinguishing the life of those individuals condemned to death upon their conviction for capital offenses committed after May 1, 2000. The Legislature's adoption of lethal injection as the exclusive method for executing the death penalty in Georgia reflects societal consensus that the "science of the present day" has provided a less painful, less barbarous means for taking the life of condemned prisoners. See *In re Kemmler*, supra, 136 U. S. at 444. This action by our State Legislature in totally abolishing electrocution as a future method of execution in this State constitutes the "clearest and most objective evidence" of a prevailing condemnation by the people of Georgia of that particular punishment. See *Fleming v. Zant*, supra, 259 Ga. at 689 (3).

6. Although we hold that the continued use of electrocution for executing death sentences in Georgia violates the Georgia Constitution, sentences of death which previously would have been executed by electrocution are not thereby rendered void. "Where one portion of a statute is unconstitutional, this court has the power to sever that portion of the statute and preserve the remainder if the remaining portion of the Act accomplishes the purpose the legislature intended.

---

[6] That evidence included not only the State's lethal injection protocol but also testimony given by a defense witness at a November 1995 hearing, which was expressly incorporated by the defense into the evidence at the March 2001 hearing.

[Cits.]" *Nixon v. State*, 256 Ga. 261, 264 (3) (347 SE2d 592) (1986). The severability of the sentence of death from the method of execution of that sentence in Georgia law is apparent in the death penalty statutes as they appeared before their recent amendment and in the nature of their amendment. See OCGA § 17-10-30 et seq.; Ga. L. 2000, p. 947, § 1 et seq.; see also OCGA § 1-1-3. In fact, the portions of former OCGA § 17-10-30 et seq. which would otherwise have been stricken by this Court's decision regarding electrocution have already been amended by the codified portions of the General Assembly's recent legislation in a manner that is consistent with this decision. See Ga. L. 2000, p. 947, § 1 et seq. Therefore, only those uncodified portions of that recent legislation that retained the use of electrocution for the punishment of capital offenses committed before May 1, 2000, are hereby declared void. The remaining portions are to be given full effect, including those portions providing for the execution of all death sentences by lethal injection in the event, now realized, that electrocution is declared unconstitutional by this Court. Id. See also *Rooney v. North Dakota*, 196 U. S. 319, 325 (2) (25 SC 264, 49 LE 494) (1905) ("a statute which mitigates the rigor of the law in force at the time a crime was committed cannot be regarded as ex post facto with reference to that crime"); *Fierro*, supra, 77 F3d at 305 (A) (2) ("regardless of whether we conclude that the district court was correct in finding execution by lethal gas unconstitutional, plaintiffs' sentences of death remain unaffected").

*Judgment affirmed in Case No. S01A1041. Judgment reversed in Case No. S01A1210. All the Justices concur, except Carley, Thompson and Hines, JJ., who dissent.*

SEARS, Presiding Justice, concurring.

I concur with both the majority opinion's reasoning and judgment. I write separately only to address an argument advanced by the State in this appeal. During oral argument before the Court, the State's attorney asserted that: "this appeal is not a challenge to the method of execution [in Georgia], this is a challenge to the death penalty statute as a whole." That argument is both misguided and inaccurate. The **only** issue considered and addressed by the Court in this matter is whether electrocution as a means of effectuating death sentences comports with the evolving standards of decency required under the Georgia Constitution.[7] Today, the Court concludes that electrocution no longer comports with those standards. That ruling, however, has no impact whatsoever on the viability of the death penalty in Georgia. Through this state's death penalty statute, our citi-

---

[7] See Ga. Const., Art. I, Sec. I, Par. XVII.

zens long ago resolved that our government has the legal right to take a defendant's life as punishment for the profound suffering the defendant has caused.[8] Notwithstanding the rhetoric of some, the point must not be lost that the efficacy of Georgia's death penalty statute is not diluted one bit by today's opinion, and the punishment of death remains an available sentence under the law.

THOMPSON, Justice, dissenting.

1. Today, a majority of this Court has decided that lethal injection will be the method of execution for all condemned inmates in this state. For those who view appellate courts as a means of achieving desired policy goals and especially this desired policy goal, the majority's opinion will be considered a victory. For those who understand that it is the role of the courts to interpret the laws and not to make them, the effect will be the opposite, regardless of the merits of electrocution versus lethal injection.

This Court is vested with the power to review "all cases in which the constitutionality of a law, ordinance, or constitutional provision has been drawn in question[.]" Ga. Const. Art. VI, Sec. VI, Par. II. It is our role to interpret the laws, to apply and judicially administer them while enforcing them in a case of litigation, such as the case now before us. See *Thompson v. Talmadge*, 201 Ga. 867, 874 (41 SE2d 883) (1947). We do not make the laws; the General Assembly makes the laws. Id. Of course, carried far enough, the power to interpret the laws, to pass upon their constitutionality, becomes the power to make them.

> Our task here, as must so frequently be emphasized and re-emphasized, is to pass upon the constitutionality of legislation that has been enacted and that is challenged. This is the sole task for judges. We should not allow our personal preferences as to the wisdom of legislative and congressional action, or our distaste for such action, to guide our judicial decision in cases such as these. The temptations to cross that policy line are very great.

*Furman v. Georgia*, 408 U. S. 238, 411 (92 SC 2726, 33 LE2d 346) (1972) (Blackmun, J., dissenting).

2. Based on a new interpretation of the Georgia Constitution, the majority has determined that the legislature really meant to abolish execution by electrocution for all condemned prisoners when it amended OCGA § 17-10-38. They have determined that this amendment reflects the shifting or evolution of the societal consensus on

---

[8] OCGA § 17-10-30 et seq.

state imposed electrocution. In fact, they proclaim that the amendment itself is "clear and objective evidence" that the General Assembly, and therefore the people of this state, condemn any future use of electrocution as a means of execution because they consider it to be cruel and unusual. And they determine all this despite the fact that the amended statute plainly states that "Code Section 17-10-38 as it existed prior to its amendment . . . shall continue to apply ·with respect to crimes committed prior to May 1, 2000[.]" Ga. L. 2000, p. 949, § 6.

As this case illustrates, legislatures are better suited to determining the contemporary standards than are the courts.

> "Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits. Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures."

*Gregg v. Georgia*, 428 U. S. 153, 175 (96 SC 2909, 49 LE2d 859) (1976), quoting *Dennis v. United States*, 341 U. S. 494, 525 (71 SC 857, 95 LE 1137) (1951) (Frankfurter, J., concurring in affirmance of judgment). That is not to say that the courts play no role in the determination of whether a punishment is constitutionally forbidden; the constitutional proscription against cruel and unusual punishments does function as a restraint upon the legislature's creation of punishments that inflict cruelty or unnecessary suffering. See *Gregg*, supra at 174. But that does not mean that the courts may override the legislature's role in reflecting society's attitudes and moral values.

> [A] heavy burden rests on those who would attack the judgment of the representatives of the people. . . . This is true in part because the constitutional test [for cruel and unusual punishment] is intertwined with an assessment of contemporary standards. . . . "In a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." [Cit.]

*Gregg*, 428 U. S. at 175-176. The democratic process can be slow, confusing, and confounding. But, unlike the controlled presentation of evidence by litigants in a courtroom, it allows citizens unrelated to the cause in action to weigh in with their opinions, to contact their representatives and let their thoughts be known. Thus, the General

Assembly is much better positioned than this Court to sift through the wide range of information, opinions, values, motives and ideals held by the citizens of this state and arrive at a consensus. The Justices of this Court should not substitute their judgment for that of the legislature.

The majority posits that when drafting the amendment, the General Assembly prepared for the possibility that this Court might eventually declare execution by electrocution unconstitutional. According to the majority, the "what may be" language in the statute shows "clear and objective evidence" that the General Assembly and thus the people of this state condemn state imposed electrocution and sought to abolish its future use. This argument is illogical and ironic. If the General Assembly sought to abolish electrocution as a method of execution, *it could have done so*. It could have established lethal injection as the sole means of execution for all condemned inmates in this state, *but it did not*. The language of this provision in the statute does indeed make a point, but not the one the majority wishes to make. The General Assembly simply planned for the possibility that this Court may step in and re-write the law in this area. Rather than signal a change in the societal consensus on electrocution, it seems that the legislature simply understood the nature of judicial power and its attendant temptations.

3. The majority now interprets the cruel and unusual clause of the Georgia Constitution to prohibit execution by electrocution.[9] It makes reference to cruelties inflicted in past eras, but fails to note that those cruelties were not ended by judicial fiat, but by legislative action. There is no guillotine in this country or burning at the stake because the people through their elected representatives will not have it, not because the courts have told the people that it violates their values.

The majority claims that state imposed electrocution has fallen

---

[9] The Supreme Court of Georgia is the final arbiter of the meaning of the Georgia Constitution. See *Michigan v. Long*, 463 U. S. 1032, 1041 (103 SC 3469, 77 LE2d 1201) (1983) (It is fundamental that state courts be left free and unfettered by federal courts in interpreting their state constitutions); *Thompson v. Talmadge*, 201 Ga. at 872 (Georgia courts have the exclusive function of interpreting the state constitution); Ga. Const. Art. VI, Sec. VI, Par. II (the Supreme Court of Georgia has exclusive appellate jurisdiction of cases involving the construction of the state constitution); Ga. Const. Art. VI, Sec. VI, Par. VI (the decisions of the Supreme Court of Georgia are binding on all other courts). As long as this Court does not invoke federal law as the basis for its decision or violate minimum federal constitutional standards, there is no higher court, including the United States Supreme Court, that can overrule us. See *Michigan v. Long*, supra; *Fleming v. Zant*, 259 Ga. 687 (3) (386 SE2d 339) (1989). It is perhaps no accident then that, despite the fact that the defendants strenuously argued that state imposed electrocution violates the Eighth Amendment of the United States Constitution, the majority confines its analysis to an interpretation of the Georgia Constitution.

into disfavor in this country, but it does not cite a single case where an appellate court in another state or the federal system has held electrocution to be cruel and unusual under a state constitution or the federal constitution. *That is because there are no such cases.*

4. The evidence regarding state imposed electrocution cited by the majority is not new. Electrocution has been Georgia's method of execution since 1924.[10] The last execution in this state occurred in June 1998.[11] As the majority acknowledges, most of the evidence in the *Moore* and *Dawson* cases has been included in the records of other cases before this Court in various forms. Much of it is drawn from the public record, such as newspaper articles describing electrocutions or law review articles doing the same. The majority describes an execution which required two jolts of electricity to effectuate. This took place in 1984. The majority cannot claim to be surprised by this evidence and suddenly spurred into action. Something may have changed in the past couple of years, but it was not the amount of available evidence on electrocution. Moreover, the General Assembly had access to most of this information when it amended OCGA § 17-10-38.

Further, the majority could not determine from the evidence whether execution by electrocution involves conscious suffering.[12] For that reason the majority focuses on mutilation as the reason it deems electrocution to be cruel and unusual. The primary evidence of this purported mutilation is the post-execution autopsy photographs of the inmates who have been executed in Georgia since the death penalty was reinstated. These photographs, some of which were taken moments before autopsy, generally show a first-degree burn the size of a quarter on one leg and sometimes several small, slight burns less than 1/4 inch in width on the scalp. These small burns generally occur where the electrodes make contact with the body.[13] From this evidence of slight bodily damage, the majority concludes that every electrocution results in mutilation. In effect, the majority defines consti-

---

[10] The 1924 statute adopted electrocution as the method of execution to replace hanging. Ga. L. 1924, p. 195, § 1.

[11] In fact, this Court unanimously affirmed that "[e]xecution by electrocution is not cruel and unusual punishment" almost a year after the last execution. See *Pruitt v. State*, 270 Ga. 745 (6) (514 SE2d 639) (1999).

[12] Experts testified that electrocution renders the condemned unconscious within milliseconds and dead within seconds, although there may be additional reflexive muscle contractions. In the *Moore* case, the trial court, which heard evidence from both sides, did not find that there was conscious suffering by the condemned and ruled that electrocution was not cruel and unusual.

[13] The majority also points out that the brain heats up to 135 or 145 degrees although it is unclear how the heating of an *internal* organ can be considered disfiguring or mutilating. It is also hard to imagine a method of death that would not damage an internal organ in some way.

tutionally forbidden "mutilation" to be anything other than a needle prick. They make clear which method of execution they prefer.

5. Capital punishment is an issue that evokes strong emotions and a wide range of views. The means by which we impose the ultimate criminal sanction speaks volumes about our values and our sense of decency, and this is precisely why the legislature, which is constituted to embody those values, has the primary role in this area. It is the General Assembly, not this Court, that is able to sift through the information and ideals held by the citizens of this state and arrive at a moral consensus, to separate justice from anger toward convicted murderers on one hand and reality from the exaggerations of the professionally sensitive on the other. The people, through their elected representatives in the General Assembly, specifically retained state imposed electrocution for all death-sentenced inmates who committed capital crimes before May 1, 2000. Ga. L. 2000, p. 947, § 1. If I were the General Assembly, I might make a different law. "But, while we have an obligation to insure that constitutional bounds are not overreached, we may not act as judges as we might as legislators." *Gregg*, 428 U. S. at 174-175. However tempted, however much they may dislike a law, courts should not use judicial power to transform their preferences into constitutional mandates. Because today's decision reflects not the evolving standards of decency of the people of Georgia, but the evolving opinions of the majority members of this Court, I dissent.

I am authorized to state that Justice Carley and Justice Hines join in this dissent.

DECIDED OCTOBER 5, 2001.

*Case No. S01A1041*

Thomas M. West, Robert H. Citronberg, for appellant.

*Paul L. Howard, Jr., District Attorney, Peggy R. Katz, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, for appellee.*

*Robert L. Tsai, Natsu T. Saito, Amy G. Donnella, Bondurant, Mixson & Elmore, Emmet J. Bondurant, Michael B. Terry, Jane E. Fahey, Rogers & Hardin, C.B. Rogers, Sutherland, Asbill & Brennan, John A. Chandler, Doffermyre, Shields, Canfield, Knowles & Devine, Ralph I. Knowles, Miles J. Alexander, amici curiae.*

*Case No. S01A1210*

*Michael Mears, Stephen B. Bright, Althea L. Buafo*, for appellant.

*Timothy G. Vaughn, District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General*, for appellee.

*Bondurant, Mixson & Elmore, Emmet J. Bondurant, Michael B. Terry, Jane E. Fahey, Rogers & Hardin, C.B. Rogers, Sutherland, Asbill & Brennan, John A. Chandler, Doffermyre, Shields, Canfield, Knowles & Devine, Ralph I. Knowles, Miles J. Alexander*, amici curiae.