# SUPREME COURT OF THE UNITED STATES

THOMAS D. ARTHUR *v.* JEFFERSON S. DUNN,
COMMISSIONER, ALABAMA DEPARTMENT
OF CORRECTIONS, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 16–602.   Decided February 21, 2017

The motion of Certain Medical Professionals and Medical Ethicists for leave to file a brief as *amici curiae* is granted.  The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER joins, dissenting from the denial of certiorari.

Nearly two years ago in *Glossip* v. *Gross*, 576 U. S. ___ (2015), the Court issued a macabre challenge.  In order to successfully attack a State's method of execution as cruel and unusual under the Eighth Amendment, a condemned prisoner must not only prove that the State's chosen method risks severe pain, but must also propose a "known and available" alternative method for his own execution. *Id.*, at ___, ___ (slip op., at 13, 15).

Petitioner Thomas Arthur, a prisoner on Alabama's death row, has met this challenge.  He has amassed significant evidence that Alabama's current lethal-injection protocol will result in intolerable and needless agony, and he has proposed an alternative—death by firing squad. The Court of Appeals, without considering any of the evidence regarding the risk posed by the current protocol, denied Arthur's claim because Alabama law does not expressly permit execution by firing squad, and so it cannot be a "known and available" alternative under *Glossip*. Because this decision permits States to immunize their methods of execution—no matter how cruel or how unusual—from judicial review and thus permits state law to subvert the Federal Constitution, I would grant certiorari

and reverse.  I dissent from my colleagues' decision not to
do so.

I

A

Execution by lethal injection is generally accomplished
through serial administration of three drugs.  First, a fast-
acting sedative such as sodium thiopental induces "a deep,
comalike unconsciousness." *Baze* v. *Rees*, 553 U. S. 35, 44
(2008) (plurality opinion).  Second, a paralytic agent—
most often pancuronium bromide—"inhibits all muscular-
skeletal movements and, by paralyzing the diaphragm,
stops respiration." *Ibid.*  Third, potassium chloride in-
duces fatal cardiac arrest. *Ibid.*

The first drug is critical; without it, the prisoner faces
the unadulterated agony of the second and third drugs.
The second drug causes "an extremely painful sensation of
crushing and suffocation," see Denno, When Legislatures
Delegate Death: The Troubling Paradox Behind State
Uses of Electrocution and Lethal Injection and What It
Says About Us, 63 Ohio St. L. J. 63, 109, n. 321 (2002); but
paralyzes the prisoner so as to "mas[k] any outward sign
of distress," thus serving States' interest "'in preserving
the dignity of the procedure,'" *Baze*, 553 U. S., at 71, 73
(Stevens, J., concurring in judgment).  And the third drug
causes an "excruciating burning sensation" that is
"equivalent to the sensation of a hot poker being inserted
into the arm" and traveling "with the chemical up the
prisoner's arm and . . . across his chest until it reaches his
heart." Denno, *supra*, at 109, n. 321.

Execution absent an adequate sedative thus produces a
nightmarish death: The condemned prisoner is conscious
but entirely paralyzed, unable to move or scream his
agony, as he suffers "what may well be the chemical
equivalent of being burned at the stake." *Glossip*, 576
U. S., at ___ (Sotomayor, J., dissenting) (slip op., at 2).

B

For many years, the barbiturate sodium thiopental seemed up to this task.[1] In 2009, however, the sole American manufacturer of sodium thiopental suspended domestic production and later left the market altogether. *Id.*, at \_\_\_–\_\_\_ (majority opinion) (slip op., at 4–5). States then began to use another barbiturate, pentobarbital. *Id.,* at \_\_\_ (slip op., at 5). But in 2013, it also became unavailable. *Id.,* at \_\_\_–\_\_\_ (slip op., at 5–6). Only then did States turn to midazolam, the drug at the center of this case.

Midazolam, like Valium and Xanax, belongs to a class of medicines known as benzodiazepines and has some anesthetic effect. *Id.*, at \_\_\_ (SOTOMAYOR, J., dissenting) (slip op., at 5). Generally, anesthetics can cause a level of sedation and depression of electrical brain activity sufficient to block *all* sensation, including pain. App. to Pet. for Cert. 283a–290a. But it is not clear that midazolam adequately serves this purpose. This is because midazolam, unlike barbiturates such as pentobarbital, has no analgesic—pain-relieving—effects. *Id.,* at 307a; see also *Glossip*, 576 U. S., at \_\_\_ (SOTOMAYOR, J., dissenting) (slip op., at 5). Thus, "for midazolam to maintain unconsciousness through application of a particular stimulus, it would need to depress electrical activity *to a deeper level* than would be required of, for example, pentobarbital." App. to

——————

[1] We examined the constitutionality of lethal injection in *Baze* v. *Rees*, 553 U. S. 35 (2008). There, the parties did not dispute that "proper administration of . . . sodium thiopental . . . eliminates any meaningful risk that a prisoner would experience pain" and results in a humane death. *Id.*, at 49 (plurality opinion). The petitioners nonetheless challenged Kentucky's three-drug protocol on the ground that, if prison executioners failed to follow the mandated procedures, an unconstitutional risk of significant pain would result. *Ibid*. A plurality of the Court concluded that "petitioners ha[d] not carried their burden of showing that the risk of pain from maladministration of a concededly humane lethal injection protocol" would violate the prohibition on cruel and unusual punishments. *Id.*, at 41.

Pet. for Cert. 307a.[2]  Although it can be used to render individuals unconscious, midazolam is not used on its own to *maintain* anesthesia—complete obliviousness to physical sensation—in surgical procedures, and indeed, the Food and Drug Administration has not approved the drug for this purpose.  *Glossip*, 576 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 5).

Like the experts in *Glossip*, the experts in this case agree that midazolam is subject to a ceiling effect, which means that there is a point at which increasing the dose of the drug does not result in any greater effect.  *Ibid.*  The main dispute with respect to midazolam relates to how this ceiling effect operates—if the ceiling on midazolam's sedative effect is reached before complete unconsciousness can be achieved, it may be incapable of keeping individuals insensate to the extreme pain and discomfort associated with administration of the second and third drugs in lethal-injection protocols.  *Ibid.*

After the horrific execution of Clayton Lockett, who, notwithstanding administration of midazolam, awoke during his execution and appeared to be in great pain, we agreed to hear the case of death row inmates seeking to avoid the same fate.  In *Glossip*, these inmates alleged that because midazolam is incapable of rendering prisoners unconscious and insensate to pain during lethal injection, Oklahoma's intended use of the drug in their execu-

_____

[2] Because "midazolam is not an analgesic drug, any painful stimulus applied to an inmate will generate and transmit full intensity pain signals to the brain without interference."  App. to Pet. for Cert.  309a.  Arthur's expert witness provides "a rough analogy":

"[I]f being sedated is like being asleep, analgesia is like wearing earplugs. If two people are sleeping equally deeply, but only one is wearing earplugs, it will be much easier to shout and wake the person who is not wearing earplugs. If two people are sedated to equivalent levels of electrical brain activity, but only one has analgesia, the person sedated without analgesia will be much more easily aroused to consciousness by the application of pain."  *Ibid.*

tions would violate the Eighth Amendment. The Court rejected this claim for two reasons.

First, the Court found that the District Court had not clearly erred in determining that "midazolam is highly likely to render a person unable to feel pain during an execution." *Id.*, at \_\_\_ (slip op., at 16). Second, the Court held that the petitioners had failed to satisfy the novel requirement of pleading and proving a "known and available alternative" method of execution. *Id.*, at \_\_\_ (slip op., at 15).

Post-*Glossip*, in order to prevail in an Eighth Amendment challenge to a State's method of execution, prisoners first must prove the State's current method "entails a substantial risk of severe pain," *id.*, at \_\_\_ (slip op., at 2), and second, must "identify a known and available alternative method of execution that entails a lesser risk of pain," *id.*, at \_\_\_ (slip op., at 1).

## II

This case centers on whether Thomas Arthur has met these requirements with respect to Alabama's lethal-injection protocol.

### A

Alabama adopted lethal injection as its default method of execution in 2002. Ala. Code §15–18–82.1(a) (2011); see also *Ex parte Borden*, 60 So. 3d 940, 941 (Ala. 2007). The State's capital punishment statute delegates the task of prescribing the drugs necessary to compound a lethal injection to the Department of Corrections. §15–18–82.1(f). Consistent with the practice in other States following the national shortage of sodium thiopental and pentobarbital, the department has adopted a protocol involving the same three drugs considered in *Glossip*. See *Brooks* v. *Warden*, 810 F. 3d 812, 823 (CA11 2016).

Perhaps anticipating constitutional challenges, Ala-

bama's legislature enacted a contingency plan: The statute provides that "[i]f electrocution or lethal injection is held to be unconstitutional . . . all persons sentenced to death for a capital crime shall be executed by any constitutional method of execution."  §15–18–82.1(c).

B

Thomas Douglas Arthur killed his paramour's husband in 1982.  840 F. 3d 1268, 1272–1273 (CA11 2016).  Over the next decade, two juries found Arthur guilty of murder, and each time, Arthur's conviction was overturned on appeal.  *Ibid.*  After a third trial in 1992, Arthur was convicted and sentenced to death.  *Ibid.*  Since then, Arthur has been scheduled to die on six separate occasions, and each time, his execution was stayed.  *Id.,* at 1275, n. 2.  After 34 years of legal challenges, Arthur has accepted that he will die for his crimes.  He now challenges only *how* the State will be permitted to kill him.

Arthur asserted two distinct claims in the District Court.  First, Arthur asserted a *facial* challenge, arguing that midazolam is generally incapable of performing as intended during Alabama's three-drug lethal-injection procedure.  Second, Arthur asserted an *as-applied* challenge, arguing that because of his individual health attributes, midazolam creates a substantial risk of severe pain for him during the procedure.

The District Court considered these two claims separately.  With respect to the facial challenge, the District Court ordered bifurcated proceedings, with the first hearing limited to the availability of a feasible alternative method of execution.  App. to Pet. for Cert. 189a, and n. 2.  Arthur's initial complaint proposed a single dose either of pentobarbital or sodium thiopental rather than a three-drug protocol, but the District Court found that those methods were unavailable given the elimination of both drugs from the domestic market.  *Id.,* at 203a–205a.

Arthur then moved to amend his complaint to allege the firing squad as an alternative method of execution. The District Court denied the motion, holding that "execution by firing squad is not permitted by statute and, therefore, is not a method of execution that could be considered either feasible or readily implemented by Alabama at this time." *Id.,* at 241a. Because Arthur's claim failed on this ground, the court never considered Arthur's evidence with respect to midazolam, despite later observing that it was "impressive." *Id.,* at 166a.

In a separate order, the District Court considered Arthur's as-applied challenge. Arthur alleged, based on the expert opinion of Dr. Jack Strader, that "his cardiovascular issues, combined with his age and emotional makeup, create a constitutionally unacceptable risk of pain that will result in a violation of the Eighth Amendment if he is executed under the [midazolam] protocol." *Id.,* at 151a. Echoing its rationale with respect to Arthur's facial challenge, the District Court found that Arthur failed to prove the existence of a feasible, readily available alternative.

The court then turned to the question it had avoided in the facial challenge: whether Alabama's lethal-injection protocol created a risk of serious illness or needless suffering. But because the District Court considered the question as part of Arthur's as-applied challenge, it focused on the protocol as applied to Arthur's personal physical condition. The court rejected Dr. Strader's opinion that the dose of midazolam required by Alabama's protocol "will likely induce a rapid and dangerous reduction in blood pressure more quickly than it results in sedation," and that during this time gap, Arthur—whom he believed to suffer from heart disease—would suffer a painful heart attack. *Id.,* at 169a. Because Dr. Strader's experience was limited to *clinical* doses of midazolam, which typically range from 2 to 5 mg, the court concluded that he had no basis to extrapolate his experience to non-clinical, *lethal*

doses, such as the 500-mg bolus required by Alabama's lethal-injection protocol. *Id.,* at 177a.

The District Court expressly refused to consider the expert opinions that Arthur proffered as part of his facial challenge, noting that they "are untested in court, due to Arthur's inability to provide a[n alternative] remedy in his facial, and now as-applied, challenges." *Id.,* at 167a, n. 16.

The District Court therefore concluded that Arthur failed to meet the *Glossip* standard and entered judgment in favor of the State. App. to Pet. for Cert. 238a.

C

The Eleventh Circuit affirmed. In a 111-page slip opinion issued the day before Arthur's scheduled execution, the court first found that "Arthur never showed Alabama's current lethal injection protocol, *per se* or as applied to him, violates the Constitution." 840 F. 3d, at 1315. The court based this finding on Arthur's failure to "satisfy the first [*Glossip*] prong as to midazolam" as part of his as-applied challenge, *ibid.*, and the fact that this Court "upheld the midazolam-based execution protocol" in *Glossip*, 840 F. 3d, at 1315. Like the District Court, the Eleventh Circuit *never* considered the evidence Arthur introduced in support of his facial challenge to the protocol. Then, "[a]s an alternative and independent ground," *ibid.*, the Court of Appeals found that the firing squad is not an available alternative because that method is "beyond [the Department of Corrections'] statutory authority," *id.*, at 1320. Finally, and as yet another independent ground for denying relief, the court held Arthur's motion regarding the firing squad barred by the doctrine of laches. *Ibid.,* n. 35. According to the Eleventh Circuit, the "known and available" alternative requirement was made clear in *Baze*— not *Glossip*—and because Arthur failed to amend his complaint in 2008 when *Baze* was decided, his claim was barred by laches.

On the day of his scheduled execution, Arthur filed a petition for certiorari and an application to stay his execution. The Court granted the stay, 580 U. S. \_\_\_ (2016), but now denies certiorari.

## III
### A

The decision below permits a State, by statute, to bar a death-row inmate from vindicating a right guaranteed by the Eighth Amendment. Under this view, even if a prisoner can prove that the State plans to kill him in an intolerably cruel manner, and even if he can prove that there is a feasible alternative, all a State has to do to execute him through an unconstitutional method is to pass a statute declining to authorize any alternative method. This cannot be right.

To begin with, it contradicts the very decisions it purports to follow—*Baze* and *Glossip*. *Glossip* based its "known and available alternative" requirement on the plurality opinion in *Baze*. *Baze*, in turn, states that "[t]o qualify, the alternative procedure must be feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain." 553 U. S., at 52 (plurality opinion). The Court did not mention—or even imply—that a State must authorize the alternative by statute. To the contrary, *Baze* held that "[i]f a State refuses to adopt such an alternative in the face of these documented advantages," its "*refusal* to change its method can be viewed as 'cruel and unusual' under the Eighth Amendment." *Ibid.* (emphasis added). The decision below turns this language on its head, holding that if the State *refuses* to adopt the alternative legislatively, the inquiry ends. That is an alarming misreading of *Baze*.

Even more troubling, by conditioning federal constitutional rights on the operation of state statutes, the decision below contravenes basic constitutional principles.

The Constitution is the "supreme law of the land"—
irrespective of contrary state laws. Art. VI, cl. 2. And for
more than two centuries it has been axiomatic that this
Court—not state courts or legislatures—is the final arbiter
of the Federal Constitution. See *Marbury* v. *Madison*, 1
Cranch 137, 177 (1803). Acting within our exclusive
"province and duty" to "say what the law is," *ibid.*, we
have interpreted the Eighth Amendment to entitle prison-
ers to relief when they succeed in proving that a State's
chosen method of execution poses a substantial risk of
severe pain and that a constitutional alternative is
"known and available," *Glossip*, 576 U. S., at ___–___ (slip
op., at 1–2). The States have no power to override this
constitutional guarantee. While States are free to define
and punish crimes, "state laws respecting crimes, punish-
ments, and criminal procedure are . . . subject to the over-
riding provisions of the United States Constitution."
*Payne* v. *Tennessee*, 501 U. S. 808, 824 (1991).

Equally untenable are the differing interpretations of
the Eighth Amendment that would result from the Elev-
enth Circuit's rule. Under the Eleventh Circuit's view,
whether an inmate who will die in an intolerably cruel
manner can obtain relief under *Glossip* depends not on the
Constitution but on vagaries of state law. The outcome of
this case, for instance, would turn on whether Arthur had
been sentenced in Oklahoma, where state law expressly
permits the firing squad, see Okla. Stat., Tit. 22, §1014
(Supp. 2016), rather than in Alabama, which—according
to the Eleventh Circuit[3]—does not, see Ala. Code §15–18–

_____

[3]I question the Eleventh Circuit's conclusion that the statute does
not authorize the firing squad as an available means of execution. In
my view, the Alabama statute unambiguously reads as a codification of
*Glossip*. If *either* of the specified methods—lethal injection *or* electrocu-
tion—is declared unconstitutional, the statute authorizes the State to
execute prisoners by "*any* constitutional method of execution." Ala.
Code §15–18–82.1(c) (2016) (emphasis added). The state statute

82.1. But since the very beginning of our Nation, we have emphasized the "necessity of uniformity" in constitutional interpretation "throughout the whole United States, upon all subjects within the purview of the constitution." *Martin* v. *Hunter's Lessee*, 1 Wheat 304, 347–348 (1816) (emphasis deleted). Nowhere is the need for uniformity more pressing than the rules governing States' imposition of death.

### B

The Eleventh Circuit's alternative holdings are unavailing.

First, the court erroneously concluded that Arthur failed to carry his burden on the first *Glossip* requirement—proving that Alabama's midazolam-centered protocol poses a substantial risk of severe pain. The court used the District Court's finding that Arthur failed to meet this prong with respect to his *as-applied* challenge to hold that Arthur's *facial* challenge likewise failed. But it is undisputed that Arthur put forth "impressive" evidence to support his facial challenge that neither the District Court nor the Court of Appeals considered. This evidence included the expert testimony of Dr. Alan Kaye, chairman of the Department of Anesthesiology at Louisiana State University's Health Sciences Center, who found the dose of midazolam prescribed in Alabama's protocol insufficient to "cure . . . the *fundamental unsuitability* of midazolam as the first drug in [Alabama's lethal-injection] protocol." App. to Pet. for Cert. 302a (emphasis added). Dr. Kaye

———————

thus permits exactly what the Court required in *Glossip*—if a condemned prisoner can prove that the lethal-injection protocol presents an unconstitutional risk of needless suffering, he may propose an alternative, constitutional means of execution, which may include the firing squad. Even assuming, however, that the Eleventh Circuit properly interpreted Alabama's statute, the question remains whether States may legislatively determine what the Eighth Amendment requires or prohibits. That question is worthy of our review.

concluded that "the chemical properties of midazolam limit its ability to depress electrical activity in the brain. The lack of another chemical property—analgesia— renders midazolam incapable of maintaining even that limited level of depressed electrical activity under the undiminished pain of the second and third lethal injection drugs." *Id.*, at 311a.

The court next read *Glossip* as categorically "uph[olding] the midazolam-based execution protocol." 840 F. 3d, at 1315. *Glossip* did no such thing. The majority opinion in *Glossip* concluded that, based on the facts presented in that case, "[t]he District Court did not commit clear error when it found that midazolam is highly likely to render a person unable to feel pain during an execution." 576 U. S., at ____ (slip op., at 16). The opinion made no determination whether midazolam-centered lethal injection represents a constitutional method of execution.

Finally, the court's laches finding faults Arthur for failing to act immediately after *Baze*, which, according to the panel, "made clear in 2008 . . . that a petitioner-inmate had the burden to show that a proffered alternative was 'feasible, readily implemented, and in fact significantly reduced a substantial risk of pain.'" 840 F. 3d, at 1320, n. 35 (quoting *Baze*, 553 U. S., at 41). But the District Court in this case—not to mention at least four Justices of this Court, see *Glossip*, 576 U. S., at ___–___ (SOTOMAYOR, J., dissenting) (slip op., at 24–27)—did not read *Baze* as requiring an alternative. See Record in *Arthur* v. *Myers*, No. 2:11–cv–438 (MD Ala.), Doc. 195, p. 11 ("[T]he court does not accept the State's argument that [a known and available alternative method of execution] is a specific pleading requirement set forth by *Baze* that must be properly alleged before a case can survive a motion to dismiss"). Arthur filed a statement within 14 days of our decision in *Glossip* informing the District Court of his belief that our decision would impact his case, see *id.*, Doc.

245, and moved to amend his complaint a few weeks later, see *id.*, Doc. 256.

In sum, the Eleventh Circuit's opinion rests on quicksand foundations and flouts the Constitution, as well as the Court's decisions in *Baze* and *Glossip*. These errors alone counsel in favor of certiorari.

## IV

The decision below is all the more troubling because it would put an end to an ongoing national conversation— between the legislatures and the courts—around the methods of execution the Constitution tolerates. The meaning of the Eighth Amendment's prohibition on cruel and unusual punishments "is determined not by the standards that prevailed when the Eighth Amendment was adopted in 1791" but instead derives from "'the evolving standards of decency that mark the progress of a maturing society.'" *Kennedy* v. *Louisiana*, 554 U. S. 407, 419 (2008) (quoting *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion)). Evolving standards have yielded a familiar cycle: States develop a method of execution, which is generally accepted for a time. Science then reveals that—unknown to the previous generation—the States' chosen method of execution causes unconstitutional levels of suffering. A new method of execution is devised, and the dialogue continues. The Eighth Amendment requires this conversation. States should not be permitted to silence it by statute.

## A

From the time of the founding until the early 20th century, hanging was the preferred practice. Gardner, Executions and Indignities—An Eighth Amendment Assessment of Methods of Inflicting Capital Punishment, 39 Ohio St. L. J. 96, 119 (1978). After several grotesque failures at the gallows—including slow asphyxiation and violent

decapitation—revealed the "crude and imprecise" nature of the practice, *Campbell* v. *Wood*, 511 U. S. 1119, 1122 (1994) (Blackmun, J., dissenting from denial of certiorari), States sought to execute condemned prisoners "'in a less barbarous manner'" and settled on electrocution. See *In re Kemmler*, 136 U. S. 436, 444 (1890).

New York carried out the world's first electrocution in ghastly fashion,[4] leading the New York Times to declare it "a disgrace to civilization." See Far Worse Than Hanging, N. Y. Times, Aug. 7, 1890, p. 1. Electrocution nonetheless remained the dominant mode of execution for more than a century, until the specter of charred and grossly disfigured bodies proved too much for the public, and the courts, to bear.[5] See, *e.g., Dawson* v. *State*, 274 Ga. 327, 335, 554

_____

[4] New York executed William Kemmler on August 6, 1890. According to the New York Times, "[p]robably no convicted murderer of modern times has been made to suffer as Kemmler suffered." Far Worse Than Hanging, N. Y. Times, Aug. 7, 1890, p. 1. Witnesses recounted the execution:

"After the first convulsion there was not the slightest movement of Kemmler's body. . . . Then the eyes that had been momentarily turned from Kemmler's body returned to it and gazed with horror on what they saw. The men rose from their chairs impulsively and groaned at the agony they felt. 'Great God! [H]e is alive!' [S]omeone said[.] 'Turn on the current,' said another . . . .

"Again came that click as before, and again the body of the unconscious wretch in the chair became as rigid as one of bronze. It was awful, and the witnesses were so horrified by the ghastly sight that they could not take their eyes off it. The dynamo did not seem to run smoothly. The current could be heard sharply snapping. Blood began to appear on the face of the wretch in the chair. It stood on the face like sweat. . . .

"An awful odor began to permeate the death chamber, and then, as though to cap the climax of this fearful sight, it was seen that the hair under and around the electrode on the head and the flesh under and around the electrode at the base of the spine was singeing. The stench was unbearable." *Ibid.* (paragraph break omitted).

[5] After a particularly gruesome electrocution in Florida, this Court granted certiorari on the question whether electrocution creates a

S. E. 2d 137, 144 (2001) ("[W]e hold that death by electro-cution, with its specter of excruciating pain and its cer-tainty of cooked brains and blistered bodies, violates the prohibition against cruel and unusual punishment").

The States then tried lethal gas. Although the gas chamber was initially believed to produce relatively pain-less death, it ultimately became clear that it exacted "exquisitely painful" sensations of "anxiety, panic, [and] terror," leading courts to declare it unconstitutional. See, *e.g., Fierro* v. *Gomez*, 77 F. 3d 301, 308 (CA9 1996) (inter-nal quotation marks omitted).[6]

Finally, States turned to a "more humane and palata-ble" method of execution: lethal injection. Denno, 63 Ohio St. L. J*.,* at 92. Texas performed the first lethal injection in 1982 and, impressed with the apparent ease of the process, other States quickly followed suit. S. Banner, The Death Penalty: An American History 297 (2002). One prison chaplain marveled: "'It's extremely sanitary. . . . The guy just goes to sleep. That's all there is to it.'" *Ibid.* What cruel irony that the method that appears most humane may turn out to be our most cruel experiment yet.

B

Science and experience are now revealing that, at least with respect to midazolam-centered protocols, prisoners executed by lethal injection are suffering horrifying deaths beneath a "medically sterile aura of peace." Denno, *supra*,

―――――――

constitutionally unacceptable risk of physical suffering in violation of the Eighth Amendment, see *Bryan* v. *Moore*, 528 U. S. 960 (1999), but later dismissed the writ as improvidently granted in light of an amendment to the State's execution statute that permitted prisoners to choose lethal injection rather than electrocution, see *Bryan* v. *Moore*, 528 U. S. 1133 (2000). See also Fla. Stat. Ann. §922.10 (West 2001).

[6] This Court granted certiorari in *Fierro*, vacated the judgment, and remanded for consideration in light of the California Legislature's adoption of lethal injection as the State's primary method of execution. See *Gomez* v. *Fierro*, 519 U. S. 918 (1996).

at 66.  Even if we sweep aside the scientific evidence, we should not blind ourselves to the mounting firsthand evidence that midazolam is simply unable to render prisoners insensate to the pain of execution.  The examples abound.

After Ohio administered midazolam during the execution of Dennis McGuire in January 2014, he "strained against the restraints around his body, and . . . repeatedly gasped for air, making snorting and choking sounds for about 10 minutes."  Johnson, Inmate's Death Called 'Horrific', Columbus Dispatch, Jan. 17, 2014, pp. A1, A10.

The scene was much the same during Oklahoma's execution of Clayton Lockett in April 2014.  After executioners administered midazolam and declared him unconscious, Lockett began to writhe against his restraints, saying, "[t]his s*** is f***ing with my mind," "something is wrong," and "[t]he drugs aren't working."  *Glossip*, 576 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 3).

When Arizona executed Joseph Rudolph Wood in July 2014 using a midazolam-based protocol, he "gulped like a fish on land."  Kiefer, Botched Execution, Arizona Dispatch, July 24, 2014, pp. A1, A9.  A witness reported more than 640 gasps as Woods convulsed on the gurney for more than an hour and a half before being declared dead. *Ibid.*

Finally, and just over a month after this Court stayed Thomas Arthur's execution, Alabama executed Ronald Bert Smith.  Following the dose of midazolam, Smith "clenched his fist" and was "apparently struggling for breath as he heaved and coughed for about 13 minutes."  Berman & Barnes, Alabama Inmate was Heaving, Coughing During Lethal-Injection Execution, Washington Post, Dec. 10, 2016, p. A3.

It may well be that as originally designed, lethal injection can be carried out in a humane fashion that comports with the Eighth Amendment.  But our lived experience

belies any suggestion that midazolam reliably renders prisoners entirely unconscious to the searing pain of the latter two drugs. These accounts are especially terrifying considering that each of these men received doses of powerful paralytic agents, which likely masked the full extent of their pain. Like a hangman's poorly tied noose or a malfunctioning electric chair, midazolam might render our latest method of execution too much for our conscience— and the Constitution—to bear.

## C

As an alternative to death by midazolam, Thomas Arthur has proposed death by firing squad. Some might find this choice regressive, but the available evidence suggests "that a competently performed shooting may cause nearly instant death." Denno, Is Electrocution An Unconstitutional Method of Execution? The Engineering of Death Over the Century, 35 Wm. & Mary L. Rev. 551, 688 (1994). In addition to being near instant, death by shooting may also be comparatively painless. See Banner, *supra,* at 203. And historically, the firing squad has yielded significantly fewer botched executions. See A. Sarat, Gruesome Spectacles: Botched Executions and America's Death Penalty, App. A, p. 177 (2014) (calculating that while 7.12% of the 1,054 executions by lethal injection between 1900 and 2010 were "botched," none of the 34 executions by firing squad had been).

Chief Justice Warren famously wrote that "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Trop*, 356 U. S., at 100 (plurality opinion). States have designed lethal-injection protocols with a view toward protecting their own dignity, but they should not be permitted to shield the true horror of executions from official and public view. Condemned prisoners, like Arthur, might find more dignity in an instantaneous death rather than prolonged torture on a

medical gurney.

To be clear, this is not a matter of permitting inmates to choose the manner of death that best suits their desires. It is a matter of permitting a death row inmate to make the showing *Glossip* requires in order to prove that the Constitution demands something less cruel and less unusual than what the State has offered. Having met the challenge set forth in *Glossip*, Arthur deserves the opportunity to have his claim fairly reviewed in court. The Eleventh Circuit denied him this opportunity, and in doing so, thwarted the Court's decision in *Glossip*, as well as basic constitutional principles.

\*    \*    \*

Twice in recent years, this Court has observed that it "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Baze*, 553 U. S., at 48 (plurality opinion); *Glossip*, 576 U. S., at ___ (slip op., at 3) (same). In *Glossip*, the majority opinion remarked that the Court "did not retreat" from this nonintervention strategy even after Louisiana strapped a 17-year-old boy to its electric chair and, having failed to kill him the first time, argued for a second try—which this Court permitted. *Id.*, at ___–___ (slip op., at 3–4). We should not be proud of this history. Nor should we rely on it to excuse our current inaction.

I dissent.